**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE:  Decker Oaks Development II, Ltd., | § | |
| Debtor | § | |
| ——————————————————— | § | |
| | § | |
| ROYCE HOMES, L.P., | § | |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | CIVIL ACTION  NO. H-08-2070 |
| | § | Bankruptcy Case:  07-35557 |
| DECKER OAKS DEVELOPMENT II, | § | Adversary Case:  07-3421 |
| LTD., ROBERT WEEDN | § | |
| DEVELOPMENT, LTD. and ROBERT | § | |
| WEEDN, Individually, | § | |
| | § | |
| Appellees. | § | |

## MEMORANDUM AND ORDER

Royce Homes, L.P. appeals from the bankruptcy court's judgment in this adversary

proceeding awarding Decker Oaks Development II, Ltd. $2,309,500 in damages.  The

damage award was based on the bankruptcy judge's ruling, following a bench trial, that

Royce Homes tortiously interfered with a third party's earnest money contract to purchase

raw land from Decker Oaks for development and that the tortious interference not only

caused the third party to exercise its option to cancel the contract during a 30-day "feasibility

period," but also resulted in Decker Oaks's mortgage lenders foreclosing on the property

over a year later.  The $2.3 million in damages consisted of the profits Decker Oaks would

have made had the sale under the contract closed and the deficiency judgment remaining

after its lenders foreclosed.  The bankruptcy court also concluded that Royce Homes had materially breached a second contract it had with Decker Oaks, to purchase residential lots in a separate development.  The court held that Decker Oaks was not required to release $62,000 that Royce Homes had paid as earnest money under that contract.

Royce Homes appeals both rulings, asking this court to reverse the tortious interference damage award and to order Decker Oaks to release the $62,000 in earnest money.  Decker Oaks cross-appeals, arguing that if this court concludes that Royce Homes did not tortiously interfere with an existing contract, it should hold that the bankruptcy court erred in finding no tortious interference with a prospective contract.

Based on a careful review of the record and the applicable law, this court reverses the bankruptcy court's rulings that Royce Homes's tortious interference with an earnest money contract Decker Oaks had with a third party proximately caused the loss of that contract and resulted in consequential damages that included the deficiency that remained after foreclosure. This court also reverses the bankruptcy court's ruling that Decker Oaks is entitled to retain the $62,000 of Royce Homes's earnest money.  Decker Oaks's cross-appeal is denied as moot.

The reasons for these rulings are explained in detail below.

## I.  Background

### A.  The Tortious Interference Claim

#### 1.  The Earnest Money Contract

Decker Oaks owned raw land north of Houston that it intended to develop as a residential subdivision called "Saratoga Springs."  On September 22, 2001, David Weber, the

CFO and manager of the land-development department at Royce Homes, signed a contract with Decker Oaks for Royce Homes to purchase 196 single-family lots in the Saratoga Springs development.  The contract specified that Royce Homes would purchase 55 by 120 foot lots for $23,000 per lot and 65 by 125 foot lots for $27,000 per lot.  (Docket Entry No. 7, Ex. 1 § 1.02).  The contract stated that the lots were described with greater particularity in an attached "Exhibit A."  (*Id.*, Ex. 1 § 1.01).  There was no Exhibit A attached to the contract that Weber signed.

Royce Homes's obligation to purchase the lots was to be secured by $25,000 in earnest money.  (*Id.*, Ex. 1 § 1.04).  The contract stated that Royce Homes would not be obligated to purchase any lot until "Substantial Completion" of the development.  "Substantial Completion" included clearing and grading the lots, installing utility connections, and obtaining zoning and government permits.  (*Id.*, Ex.  1 § VI).  The contract set a time frame for "Substantial Completion," stating that "Seller [Decker Oaks] shall use Seller's good faith efforts to achieve the Substantial Completion requirements by April 1, 2002.  (*Id.*).  The contract gave Royce Homes the right, but not the obligation, to extend the period for up to 90 days if Decker Oaks had not achieved "Substantial Completion" by June 1, 2002.  The contract stated:

> If Seller has not achieved the Substantial Completion Date by June 1, 2002, Purchaser shall have the right, at Purchaser's sole discretion, to terminate the Contract, or Purchaser may extend the date for Seller's achievement of Substantial Completion for one or more periods not exceeding, in the aggregate, ninety (90) days. If Purchaser chooses to terminate the Contract, then the

> Purchaser shall be entitled to the immediate return of the Earnest Money.

(*Id.*).

The contract also set out remedies for Royce Homes in the event Decker Oaks defaulted under the contract:

> If Seller defaults in performing Seller's obligations hereunder . . . Purchaser shall be entitled, as Purchaser's sole and exclusive remedy, to (i) waive the contractual obligations of Seller in writing; (ii) extend the time for performance by such period of time as may be mutually agreed upon in writing by the Parties hereto; (iii) terminate this Contract and receive a return of the Earnest Money then on deposit; or (iv) enforce specific performance of this Contract as Purchaser's sole remedy at law.

(*Id.*, Ex. 1 § 5.02).

The contract stated that an "Initial Closing" would occur no later than 30 days after "Substantial Completion." (*Id.*, Ex. 1 § 3.01). Royce Homes was obligated to purchase 10 lots at the Initial Closing, an additional 10 lots no later than 120 days thereafter, and at least 10 lots every 90 days thereafter until it had purchased 196 lots. (*Id.*, Ex. 1 § 3.02). The contract provided that Royce Homes would pay interest in the amount of 8% per annum on each lot between the Initial Closing and the closing on the particular lot. Weber crossed out the "8%" and wrote in "7%," initialing the change. (*Id.*, Ex. 1 § 1.03).

On November 16, 2001, Decker Oaks's principal, Robert Weedn, signed the copy of the Saratoga Springs contract that Weber had signed. Weedn made a handwritten, initialed modification increasing the purchase price on the 55 by 120-foot lots from $23,000 to $23,500. (*Id.*, Ex. 1 § 1.02). Weedn did not initial Weber's handwritten modification to the

4

interest rate.  (*Id.*, Ex. 1 § 1.03).  No one from Royce Homes initialed or signed the contract after Weedn's modification.  (*Id.*, Ex. 1 at 18).  There was no Exhibit A describing the land attached to the copy that Weedn signed.

Also on November 16, 2001, the parties signed a side agreement that gave Decker Oaks the right to enforce purchase of the first 25 lots by specific performance.  (*Id.*, Ex. 2).  On January 16, 2002, under the contract, Royce Homes deposited $25,000 in earnest money with the Stewart Title Company.  (*Id.*, Ex. 4).

Decker Oaks did not achieve "Substantial Completion" by April 1, 2002, by June 1, 2002, or by 90 days thereafter.  Decker Oaks did not obtain approval from the City of Tomball for the Saratoga Springs subdivision, a required condition for "Substantial Completion," until late 2005 due to delays in obtaining permits and problems in meeting the City's infrastructure requirements.  (*Id.*, Exs. 11, 13).  During this time, Royce Homes took no action to terminate the contract and did not seek to recover its earnest money.  There is no evidence in the record that Royce Homes and Decker Oaks discussed extending the period for "Substantial Completion."

Royce Homes assisted Decker Oaks in 2003 when it sought financing for the Saratoga Springs development.  On February 11, 2003, Royce Homes gave Decker Oaks a letter to give to prospective lenders.  The letter stated that Royce Homes had a "continued interest in the Saratoga residential development" and "look[ed] forward to the delivery of lots and the ability to continue sales in this market segment."  (*Id.*, Ex. 7).  On June 4, 2003, at Decker Oaks's

request, Royce Homes provided a copy of its liability insurance policy for Decker Oaks to show to lenders.  (*Id.*, Exs. 8, 9; Bkrtcy Rec., Ex. 13 at 93–94).

Royce Homes followed the progress of the Saratoga Springs development.  An internal note dated July 11, 2003 stated that Decker Oaks was "having loan problems, construction setbacks, and permit delays."  (Docket Entry No. 7, Ex. 17).  Royce Homes was aware of the fact that in March 2004, Weedn learned that the City of Tomball would not provide Decker Oaks with $630,000 in funds needed to bring the Saratoga Springs development into regulatory compliance.  (*Id.*, Ex. 11).

## 2.    The Royce Homes Memorandum of Contract

In 2004, Royce Homes asked Stewart Title to file in the real property records a Memorandum of Contract describing Royce Homes's 2001 contract with Decker Oaks.  On April 21, 2004, Stewart Title filed a Memorandum of Contract in the real property records of Montgomery County.  The Memorandum of Contract described the property that was the subject of the 2001 contract: "196 single family residential lots out of the property described on Exhibit 'A' attached hereto and made a part hereof."   The stated purpose of the Memorandum was to "give[ ] to evidence of public record Purchaser's right to acquire the Property pursuant to the terms of a Contract of Sale by and between Purchaser and Seller dated effective November 16, 2001."  (*Id.*, Ex. 12).  There was an Exhibit A attached to the Memorandum of Contract.  The parties agree that this document was not attached to the 2001 contract between Decker Oaks and Royce Homes.  Exhibit A attached to the Memorandum of Contract described the entire acreage of the Saratoga Springs subdivision as the subject of

the Royce Homes contract with Decker Oaks.  Exhibit A did not describe the individual lots within that acreage or indicate which lots Royce Homes had contracted to purchase.  (*Id.*; Bkrtcy Rec., Ex. 13 at 137–38).

Robert Kopecky, who assumed Weber's role as director of land development at Royce Homes in 2003 and who was responsible for asking Stewart Title to file the Memorandum of Contract, testified in the bench trial that it was not common practice within the industry to file this type of Memorandum in the property records.  (Bkrtcy Rec., Ex. 13 at 49, 97).  Kopecky testified that he took this step because he had "heard rumors" through the "industry grapevine" that "maybe Mr. Weedn was attempting to sell the lots to someone else."  Kopecky wanted to "put everybody on notice that [Royce Homes] did have a contract and we intended to live up to our end of the contract."  (*Id.*, Ex. 13 at 94).

Royce Homes's internal notes from November 30, 2004 stated that Weedn "acknowledged that we are under contract" but "cannot perform under the contract as the City of Tomball is requiring 75' lots for single family residential lots."  (Docket Entry No. 7, Ex. 17).  The notes stated that Weedn offered 55-foot lots at $27,500 per lot but said that the "window of opportunity [wa]s closing even for patio homes because the City of Tomball has told him that they are going to stop approving patio home lots in the near future."  (*Id.*).

On June 3, 2005, Susie Coffmann Weedn sent a letter on behalf of Decker Oaks to one of the lenders for the Saratoga Springs development.  She attached a copy of what she characterized as the "Terminated Contract with Royce Homes."  (*Id.*, Ex. 22).  Susie Weedn stated that this "Terminated Contract" showed that Royce Homes had been willing to enter

7

a "substantial contract[ ]" to purchase the property, and that Royce Homes had "indicated verbally that they are and remain interested in our project and would negotiate with us again," at an "increase[d] . . . lot price to cover some of the overages that became obvious to us during the excavation period while under contract, last." (*Id.*).  The letter also stated that the Royce Homes contract had terminated because Royce Homes was "not willing to tie up their funds in earnest[ ] any longer." (*Id.*).  This last statement was inaccurate.  Royce Homes had not demanded the return of its $25,000 in earnest money.   Decker Oaks still had those funds. (Bkrtcy Rec., Ex. 14 at 41).

Decker Oaks received final approval from the City of Tomball for the Saratoga Springs development in approximately November 2005.  The delays in the approval process had raised the Phase I development cost from a projected $3.2 million to $6.2 million.  (*Id.*, Ex. 14 at 140).  By this time, Decker Oaks had obtained two construction loans to develop the property, $2,650,000 from Capital One and $1,040,500 from Traditions Bank.  (*Id.*, Ex. 14 at 141, 153).  In November 2005, Decker Oaks began marketing the lots in the Saratoga Springs subdivision.  During this time, Decker Oaks also began to seek a purchaser for the entire Saratoga Springs subdivision.  On January 1, 2006, Weedn posted a sign advertising the sale of the subdivision.  He received indications of interest from over twenty prospective purchasers.  (*Id.*, Ex. 14 at 142–43).

On November 2, 2005, Royce Homes received an email from a real estate broker offering lots for sale in the Saratoga Springs subdivision.  The offering described "250 Lots in Phase I with 55 footers $27,900 and 60 footers $30,500.  Phase I mostly 55 footers."

8

(Docket Entry No. 7, Ex. 25).  Kopecky testified that the November 2, 2005 email made him "angry," (Bkrtcy Rec., Ex. 13 at 145), and "prompted [him] to make darn sure that the Memorandum of Contract had been filed as [he] had instructed it to be," (*id.*, Ex. 13 at 104). Kopecky's assistant discovered that the Memorandum of Contract had been filed in the Montgomery County real property records, which was incorrect because the Saratoga Springs subdivision was located in Harris County.  (*Id.*, Ex. 13 at 105).  Kopecky asked Stewart Title to refile the Memorandum of Contract in the Harris County real property records.  That was done on January 11, 2006.  (Docket Entry No. 7, Ex. 12).

Robert Weedn testified that Kopecky called him around this time to discuss Decker Oaks's apparent plans to sell the Saratoga Springs subdivision.  Weedn testified that he explained to Kopecky that Decker Oaks was considering selling the entire subdivision "[b]ecause if the city has made these changes up to this point . . . [Decker Oaks would] rather go on and prefer to sell it."  (Bkrtcy Rec., Ex. 14 at 142).  According to Weedn, Kopecky responded: "Robert, do you remember we used to have a contract on that?"  Weedn replied: "George, that contract was a long time ago, 2001 . . . way back there in 2001, that's long gone."  (*Id.*, Ex. 14 at 142–43).  Weedn testified that Kopecky "did not argue . . . at that time" that the contract was still in effect.  (*Id.*, Ex. 14 at 143).  Kopecky did not specifically testify about this conversation, but did state that he spoke by telephone to Weedn on several occasions about Decker Oaks's desire to sell the subdivision.  (*Id.*, Ex. 13 at 146–48).

### 3.     The Bryant Investors' Contract

9

On January 19, 2006, Decker Oaks received a letter of intent from a group of investors led by Steven C. Bryant to purchase the entire Saratoga Springs subdivision.  (Docket Entry No. 10, Ex. 15).  Royce Homes asserts, and Decker Oaks does not dispute, that Royce Homes had no knowledge about this potential offer when it filed the Memorandum of Contract in Harris County on January 11, 2006, eight days earlier.  (Bkrtcy Rec., Ex. 13 at 112).

On January 27, 2006, the Bryant investors and Decker Oaks executed an earnest money contract for the sale of the Saratoga Springs subdivision.  The relevant terms included a purchase price of $4,499,500.00, a 30-day feasibility period, and a 15-day period in which to cure any title problems.  At any time during the 30-day period, the Bryant investors had the option to withdraw their offer and recover their earnest money with no penalty.  Under the contract, if the investors sent a written notice to Decker Oaks objecting to title problems, Decker Oaks would have a 15-day period to cure, extending the 30-day feasibility period.  If Decker Oaks failed to cure, the Bryant investors would have 5 days to withdraw their offer and receive their earnest money (less $100).  (Docket Entry No. 7, Ex. 29).

The proposed purchase was not contingent on third-party financing.  (*Id.*).  Closing the sale would have yielded Decker Oaks $809,500 after paying off the $3,690,000 balance on the two mortgages.  (Bkrtcy Rec., Ex. 16 at 61).

During a title search, the Bryant investors discovered Royce Homes's Memorandum of Contract in the Harris County property records.  At the bench trial, Weedn testified that Bryant "called up back and he said there's a cloud on the title, there's this memorandum of contract from Royce Homes."  Weedn testified that Bryant told him "that he couldn't buy it

10

or wouldn't buy it with this title defect." (*Id.*, Ex. 14 at 144–45). Weedn testified that Bryant "called us up and . . . [said] there was a Memorandum of Contract or a cloud on the title. He was going to terminate the contract but he was – continued to be interested in the property and he'd be working with his group if the title objection ever got off the title." (*Id.*, Ex. 15 at 9–10). Royce Homes did not raise a hearsay objection to this testimony.

Weedn testified that he called Kopecky and told him that Royce Homes's failure to remove the Memorandum of Contract from the Harris County property records was a significant problem. Weedn testified that he asked Kopecky, "what are you trying to do? . . . I have put this land up for sale. I talked to you recently; you stopped the sale on the project. What are you trying to accomplish?" Weedn told Kopecky that the Memorandum had "stopped everything, it was going to destroy me." (*Id.*, Ex. 14 at 145). According to Weedn, Kopecky replied that he "[d]idn't expect [Decker Oaks] to fulfill a 2001 contract," because he was aware that "the prices were too low and construction costs were up," but that he "would renegotiate a contract" and by keeping the Memorandum of Contract in the property records, "he was just trying to negotiate for a better price." (*Id.*, Ex. 14 at 146–47).

Weedn testified that he visited Kopecky in early February 2006 and told him again about the negative effect of the Memorandum of Contract. Weedn testified that he said to Kopecky, "George, you're killing me, you've already killed the sale." Weedn testified that he told Kopecky that Decker Oaks "ha[d] the loans to develop" the subdivision but "wanted to sell it." According to Weedn, Kopecky responded that "he want[ed] to work on a new contract at a higher price." (*Id.*, Ex. 14 at 148–49).

11

Royce Homes took the position in the bankruptcy court that Kopecky had a reasonable and good faith belief that the 2001 contract was still valid.  Although Kopecky disputed Weedn's account of their discussions about the 2001 contract, Kopecky testified that Weedn had called and visited him in January and February 2006.  Kopecky testified that in these discussions, he conveyed to Weedn Royce Homes's "continued interest in buying the lots," and that Weedn responded by expressing a "need to maybe raise the price."  Kopecky testified that they discussed Decker Oaks's "desire to possibly sell the project" and the effect of "the filing of the Memorandum of Contract."  (*Id.*, Ex. 13 at 148–49).

On February 7, 2006, counsel for Decker Oaks sent a letter to Royce Homes demanding the removal of the Memorandum of Contract from the Harris County property records.  The letter stated that "[b]ased on our review of the Disputed [2001] Contract and the surrounding circumstances as we understand them, it is very clear that Royce has no rights to purchase the Subject Property and no right to file the Memorandum of record, resulting in an unlawful cloud and encumbrance on title."  (Docket Entry No. 10, Ex. 29).  The letter questioned whether the 2001 contract was ever valid, noting that it "lacked any description of the Subject Property" because no Exhibit A was attached, and emphasized that in any event, it had "lapsed by its very terms."  The letter warned that by filing and refusing to withdraw the Memorandum of Contract, Royce Homes had "unlawfully and without justification clouded and encumbered the title" to the Saratoga Springs subdivision "or at least a substantial part of it" and was causing Decker Oaks "immediate and irreparable injury and damage."  The letter warned that Decker Oaks intended to hold Royce Homes liable for any

12

resulting losses, which "could be substantial given that if Royce fails to remove the Memorandum the sale of the [Saratoga Springs subdivision] to a third party will almost undoubtedly not be consummated." (*Id.*).  Royce Homes refused to remove the Memorandum of Contract from the real property records.

On February 15, 2006, the Bryant investors sent Decker Oaks a letter exercising the option under the earnest money contract to terminate the contract to purchase the Saratoga Springs property.  The letter from Steve Bryant stated:

> This letter shall serve as an official termination of the above-referenced contract.
>
> I will continue working with my group on this opportunity but rather than object to the cloud on the title from the Royce Homes 2001 contract to get more time on my feasibility period, I would rather terminate the contract, free you up to pursue other purchasers and if the property is still available when my group is ready I will discuss a new contract with you at that time.

(Docket Entry No. 7, Ex. 33).  Bryant also sent an email to the Weedns the following day that stated:  "Thank you for the opportunity to pursue this property and I very much enjoyed meeting you both.  I intend to continue working with my group and hope to be back in touch with you soon." (*Id.*).

Between January 31 and August 24, 2006, Decker Oaks sent out information about the Saratoga Springs subdivision to twenty-one potential purchasers for the entire subdivision. (*Id.*, Ex. 44).

### 4. The Banks' Refusal to Permit Draws on Construction Loans

Shortly after the Bryant investors cancelled their earnest money contract, Robert Weedn visited Kopecky again.  Weedn testified that his tone was a "little stronger" at this meeting because the mortgage lender for the Saratoga Springs subdivision had become concerned about the effect of the Memorandum of Contract.  (Bkrtcy Rec., Ex. 14 at 150). According to Weedn, before this point, Decker Oaks had been concerned only that the Memorandum of Contract would frustrate a sale of the property.  After the bank expressed concern, Decker Oaks realized that the Memorandum of Contract would also threaten its ability to draw on loan funds to develop the land as an alternative to selling.  (*Id.*, Ex. 14 at 149–150).  Weedn testified about what he told Kopecky:

> [T]he bank has told me that they're not going to release any more money on the draws.  They've done some research on their end, there is going to be no draws, not with that bank.  It stopped everything.  Of course, it's already stopped a sale, now it's stopped my development financing. . . . You know George . . . you've hogtied me with this contract.  You have extorted – you stopped a sale, you stopped my bank, now I don't have any other choice besides dealing with you.

(*Id.*, Ex. 14 at 150).  Counsel for Royce Homes did not raise a hearsay objection to Weedn's testimony about what the bank told him.  According to Weedn, Kopecky again proposed negotiating a new contract price but refused to remove the Memorandum of Contract from the Harris County real property records.  (*Id.*, Ex. 14 at 150–51).  Kopecky's testimony did not confirm or deny Weedn's account of this meeting.

Robert Weedn visited Kopecky again in early March 2006, and Susie Weedn came along.  Robert Weedn testified that he again told Kopecky that the Memorandum of Contract was affecting financing and potential sales:

> You've stopped a sale . . . the financing is now stopped on the development side, you stopped my financial world.  You've stopped everything to do with Saratoga.  Even if you give me a contract you have to take off that Memorandum of Contract because as far as the bank's concerned they think it's a – still under a 2001 price. . . .[A]s far as they're concerned I'm still legally tied to a 2001 contract.

(*Id.*, Ex. 14 at 151–52).  The bankruptcy court sustained a hearsay objection by Royce Homes's counsel as to Weedn's testimony about what the bank told him.  (*Id.*, Ex. 14 at 152).  Kopecky's testimony did not confirm or deny Weedn's account of this meeting.

On March 22, 2006, Susie Coffman Weedn wrote to one of Decker Oaks's lenders, Capital One, with an update on the potential to sell the Saratoga Springs subdivision.  The letter did not refer to any problem with drawing down funds on the construction loans.  Weedn stated:

> When our title company, Fidelity ran a title search, they discovered that Royce Homes had filed an exception to our title.  They are asserting their contract from 2001 as a valid contract locking in the price of our lots sold to them at $21,000.00 each.  Since then, we received a letter from our potential buyers that they will not purchase this property unless and until this exception is removed.

(Docket Entry No. 7, Ex. 35).  Susie Weedn added:  "Regardless of weather [sic] we sell or build this project, there is no financial way to afford honoring a five year old contract with these lot prices and it is inconceivable for any homebuilder to attempt [sic] that any developer

15

would." (*Id.*). The letter also described other plans for the Saratoga Springs subdivision, all incomplete: "[T]he construction plans needed to commence construction with Durango as the contractor or another are days away from being complete and reviewed by the City of Tomball"; "Robert [Weedn] and I have met with two additional prospective buyers in attempts to further a contract or backup contract to [the Bryant investors' contract]"; and "we have been asked by our two current builders in [another subdivision] to negotiate a contract for lots" in the Saratoga Springs subdivision. (*Id.*). Robert Weedn clarified at trial that Durango was his own construction company. (Bkrtcy Rec., Ex. 15 at 11). Robert Weedn also testified that at this time, a broker from Conroe, Texas named Tom McDonald had offered to purchase the entire Saratoga Springs subdivision. (*Id.*, Ex. 15 at 12). The record does not indicate what McDonald offered for the property or why that offer did not result in a sale.

By the time Susie Weedn's letter was sent on March 22, 2006, Royce Homes had filed suit against Decker Oaks in state court seeking specific performance under the 2001 contract. (*Id.*, Ex. 13 at 112). Weedn asked Kopecky to "drop the lawsuit and let's get on with our lives." (*Id.*, Ex. 14 at 157–58). Kopecky testified in the bench trial in the bankruptcy court that he and Weedn continued to negotiate selling lots in the Saratoga Springs subdivision at a higher price than under the 2001 contract. (*Id.*, Ex. 13 at 109–112, 146–48; Ex. 14 at 38). The negotiations did not result in any contract or sale.

On June 2, 2006, the state court judge denied Decker Oaks's motion for summary judgment in the specific performance lawsuit. (Docket Entry No. 7, Ex. 39). On June 14, 2006, Susie Weedn wrote to Capital One stating that "[i]n light of the decision not to expedite

this case under Summary Judgment," Decker Oaks was "prepared to move forward and commence construction." (*Id.*, Ex. 40). In the letter, Weedn stated that "[s]ince we have a builder contract, obviously requiring us to honor at this time, we will continue to negotiate the lot price, but must begin construction." (*Id.*). Susie Weedn sought an eight-month extension to the date the financing documents set for beginning construction. (*Id.*). The letter did not refer to any problem in drawing down construction loan funds. Robert Weedn testified that the bank denied this request for an extension because there were no "builder contracts that they were satisfied with." (Bkrtcy Rec., Ex. 15 at 15). Royce Homes did not raise a hearsay objection to this testimony.

On July 6, 2006, Decker Oaks received an offer from Great Western Land & Recreation, Inc. to buy "half of the total 55 foot and 60 foot lots" in Phases I and II of the Saratoga Springs subdivision at $27,000 and $30,000 apiece, respectively. (Docket Entry No. 7, Ex. 42). David Weber, who had worked at Royce Homes until 2003, was one of the executives at Great Western involved in the offer. Weber testified that Great Western knew of Royce Homes's Memorandum of Contract and that the Memorandum did not hinder Great Western from making the offer because executives at Great Western "knew Robert [Weedn] real well" and "it was a good location." (Bkrtcy Rec., Ex. 14 at 75). Weber testified that the price Great Western offered was a "[t]iny bit high, but on the upper side of reasonableness . . . higher than normal." (*Id.*, Ex. 14 at 87).

Also on July 6, 2006, Kopecky wrote a letter to the Weedns detailing what he characterized as a "settlement offer" to resolve the state-court litigation. The letter stated that

17

Royce Homes would purchase "all 60' and greater lots" in Phase I of the Saratoga Springs development at $28,000 apiece. Decker Oaks would be "free to sell the 55' lots to a second builder," but "Royce would have approval rights on the second builder." (Docket Entry No. 7, Ex. 42). The letter also stated that Royce Homes would be granted a "Right of First Refusal on Phase II" of the Saratoga Springs development, "with lot prices for 60' lots beginning at $28,000." (*Id.*). Royce Homes would also have approval rights on the plans for the entry monument and esplanade, and Decker Oaks would install brick columns and fence along certain parts of the subdivision. (*Id.*).

Robert Weedn testified that this was the first offer for a new contract that Royce Homes had made since Weedn had complained about the Memorandum of Contract. (Bkrtcy Rec., Ex. 14 at 158). According to Weedn, there were several problems with Royce Homes's proposal. The 60-foot lots in Phase I that Royce Homes offered to purchase were roughly one-third of the 252 lots available in Phase I. The price Royce Homes offered for those 60-foot lots was significantly lower than the price offered by Great Western. (*Id.*). The fencing that Royce Homes sought would have been "wildly expensive," costing approximately $60,000. (*Id.*, Ex. 14 at 161). Weedn was concerned that Royce Homes's approval right on a second builder could lead to a situation in which Royce Homes would be able to "finish out their lots before . . . the second builder could ever start theirs." (*Id.*, Ex. 14 at 162). Weedn testified that Kopecky had specifically said that he did not want Great Western to build in the Saratoga Springs subdivision. (*Id.*).

18

Decker Oaks neither accepted nor made a counteroffer to Kopecky's offer. Weedn testified that Decker Oaks could not accept the Great Western offer or any other offer because the bank would not release funds for Decker Oaks to spend on development until the Memorandum of Contract was released. (*Id.*, Ex. 14 at 160).

Decker Oaks did not sell or develop the Saratoga Springs subdivison or any lots in it. Traditions Bank foreclosed in November 2006 and Capital One foreclosed in March 2007. Decker Oaks had $3,690,000 in mortgage debt on the property. After the foreclosure, a $1,500,000 deficiency remained on the Capital One loan. (*Id.*, Ex. 14 at 152–53, 165–66).

### B.    The Villages of Decker Oaks Subdivision

On July 26, 2001, Royce Homes and Decker Oaks entered into a contract for Royce Homes to purchase single-family lots in Section I of a subdivision called the Villages of Decker Oaks. The contract provided that Decker Oaks would sell 120 of the 50 by 120 foot lots to Royce Homes for $18,000 per lot. (Docket Entry No. 7, Ex. 46 § 1.01). The contract stated that in the event Royce Homes defaulted under the contract, Decker Oaks would be entitled to:

> (i) waive the contractual obligations of Purchaser in writing; (ii) extend the time for performance by such period of time as may be mutually agreed upon in writing by the Parties hereto; or (iii) terminate this Contract as to all unpurchased Lots and retain or receive the Earnest Money then on deposit as liquidated damages and not as a penalty, in which event the parties shall be released herefrom and have no further rights, obligations, or responsibilities hereunder.

(*Id.*, Ex. 46 § 5.01).  The contract also stated that the parties were "entitled to written notice

of any default and shall have sixty (60) days from receipt of such notice to cure such default

prior to the exercise of any remedy provided herein." (*Id.*, Ex. 46 § VII).  On August 3, 2001,

Royce Homes deposited $10,000 in earnest money with Stewart Title.  (Bkrtcy Rec., Ex. 13

at 64).

On July 15, 2003, Royce Homes and Decker Oaks signed an amendment of the July

26, 2001 contract.  When the amendment was signed, Royce Homes had purchased 71 lots

in Section I.  (*Id.*, Ex. 14 at 124).  The amended contract incorporated the 2001 contract by

reference and supplied additional terms, as follows:

    1.    The base purchase price shall be amended to Nineteen
Thousand dollars ($19,000.00) per lot for Section II.

    2.    The 80 lots sold or available for sale in Section I are the
complete obligation of the Seller and Purchaser for
Section I and is satisfied [sic].

    3.    Purchaser shall purchase 60 lots from Section II.

    4.    Upon Sellers loan commitment the earnest money is
hereby amended to be Five Thousand dollars ($5,000.00)
and deposited with Stewart Title until the contract is
fulfilled.  At time of Seller Construction Loan
Commitment, additional earnest money of Fifty Seven
Thousand dollars ($57,000) submitted by form of Letter
of Credit shall be conveyed to Stewart Title.

    5.    This amendment is subject to the Sellers lender's
approval.

This concludes both the Seller's and Purchaser's obligations on
all lots in The Village of Decker Oaks subdivision.  All terms and

20

conditions of the Contract of Sale shall remain in effect and shall
survive this amendment.

(Docket Entry No. 7, Ex. 56).

Robert Weedn testified at the bench trial in the bankruptcy court that when the
amendment was signed, Royce Homes had closed on 71 lots in Section I and that the nine lots
remaining toward its obligation were "in the title company." (Bkrtcy Rec., Ex. 14 at 124,
126). Weedn testified that the amendment was signed with the understanding that these
remaining nine lots "would be closing any day." (*Id.*). On September 25, 2003, Susie Weedn
sent a letter to Royce Homes stating that Decker Oaks had obtained the necessary loan under
the amended contract. (Docket Entry No. 7, Ex. 58). On September 29, 2003, Royce Homes
deposited $5,000 in earnest money with Stewart Title. (*Id.*, Ex. 63). On October 2, 2003,
Decker Oaks authorized the release of the $10,000 in earnest money that Royce Homes had
deposited under the original contract. (*Id.*, Ex. 60). On October 3, 2003, Royce Homes
deposited an additional $57,000 in earnest money with Stewart Title. (*Id.*, Ex. 63). On
October 10, 2003, Decker Oaks faxed its counsel receipts from Stewart Title for $62,000 in
earnest money deposited by Royce Homes. (*Id.*).

On January 21, 2004, Robert Weedn received notice from Montgomery County that
the Texas Commission on Environmental Quality (TCEQ) had determined that the wastewater
treatment plant serving the Villages of Decker Oaks subdivision was "not functioning within
permitted parameters and d[id] not have the capacity to serve the existing number of
connections." The notice stated that "[b]ecause this situation pose[d] a potential threat to

21

public health," the County would issue no further building permits and would not approve any plats until the compliance issues had been resolved. (*Id.*, Ex. 65). A Royce Homes internal memo dated February 16, 2004 discussed the TCEQ issues and stated that a number of Royce Homes's lots in the Villages of Decker Oaks development could not be used until further notice. (*Id.*, Ex. 66). A May 27, 2004 letter from Montgomery County to Decker Oaks stated that the problem had not been resolved. (Bkrtcy Rec., Ex. 15 at 46–48). The record does not indicate whether resolution was ever achieved.

Robert Weedn testified that by the fall of 2004, the nine lots remaining under Royce Homes's contractual obligations were still "in the title company" and that Royce Homes had "never closed them." (*Id.*, Ex. 14 at 133). According to Weedn, "[t]hey told me they were [closing], they told me they were and then they kept checking with their main headquarters, never did it." (*Id.*).

On September 3, 2004, attorneys for Decker Oaks sent a letter to Royce Homes asserting that Royce Homes was in default of the July 15, 2003 amended contract. The letter stated that Royce Homes had purchased only 72 of the 81 lots in Section I that it was required to purchase under the amended contract, and that Stewart Title had not received $57,000 in earnest money. (Docket Entry No. 7, Ex. 72). The letter was inaccurate in several respects. Both parties agree, and the bankruptcy court accepted, that the actual figure was 71 of 80 required lots, and Royce Homes had in fact paid the earnest money into escrow for Decker Oaks. (Bkrtcy Rec., Ex. 15 at 48). The letter demanded that Royce Homes close on nine lots

22

in Section I and post $57,000 in earnest money by September 14, 2004.  (Docket Entry No. 7, Ex. 72).

On September 16, 2004, attorneys for Decker Oaks wrote to Royce Homes again, asserting that a notice of default with respect to the $57,000 in earnest money had been given in September 2003 and that the time to cure had "substantially passed."  The letter "terminate[d] the Contract as to all unpurchased lots, effective immediately."  The letter did not mention the nine unclosed lots as grounds for termination.  (*Id.*, Ex. 73).

Royce Homes's 2006 state court suit on the 2001 Saratoga Springs contract also included claims for fraud and breach of contract arising out of the Villages of Decker Oaks contract.  The relief Royce Homes sought included recovery of the $62,000 in earnest money.

### C.    The Bankruptcy Court Proceedings

Royce Homes's third amended petition in its state court action, filed July 10, 2006, sought $5,500,000 for damages "directly and proximately caused by" Decker Oaks's alleged fraud under the Saratoga Springs and Villages of Decker Oaks contracts, including lost profits and attorneys' fees incurred in seeking specific performance.  Royce Homes also sought the $25,000 and $62,000 in earnest money Decker Oaks had received under those contracts, or, in the alternative, a declaratory judgment stating that Royce Homes was entitled to the return of the earnest money.   Royce Homes also sought pre- and post-judgment interest and attorneys' fees.  (Bkrtcy Rec., Ex. 1).

On August 14, 2007, Decker Oaks filed for bankruptcy protection under Chapter 11. On September 17, 2007, Decker Oaks removed Royce Homes's state court suit to the

bankruptcy court.   (*Id.*).   Royce Homes moved for remand on October 8, 2007, (*id.*, Ex. 2), and the bankruptcy court denied this motion on November 6, 2007, (*id.*, Ex. 5).

On December 5, 2007, Decker Oaks filed a first amended answer and counterclaim in the bankruptcy court.   Decker Oaks sought a declaratory judgment that the 2001 Saratoga Springs contract with Royce Homes was invalid.   Decker Oaks sought damages for slander of title, tortious interference with an existing contract, tortious interference with a prospective contract, fraud, and breach of contract (in case the court were to determine that the 2001 Saratoga Springs Contract was valid).   Decker Oaks also sought damages for Royce Homes's alleged breach of the Villages of Decker Oaks contract.   Decker Oaks sought the following special damages for the claims:  1) lost profits from the Bryant investors' sale of the Saratoga Springs subdivision caused by the filing of the Memorandum of Contract; 2) lost projected profits from the development of the Saratoga Springs subdivision caused by the filing of the Memorandum of Contract; 3) loss of credit standing for Decker Oaks and Robert Weedn by reason of the default and subsequent foreclosure by its mortgage lenders caused by the filing of the Memorandum of Contract; 4) the greater of the loss of equity in the Saratoga Springs property due to foreclosures or the foreclosure deficiency judgment; and 5) loss of business reputation by Decker Oaks and Robert Weedn due to the foreclosures.  (*Id.*, Ex. 6).

The parties consented to a bench trial and filed a joint pretrial statement on February 6, 2008.  (*Id.*, Ex. 10).   The bankruptcy court conducted a three-day bench trial on February 14, 15, and 22, 2008.  (*Id.*, Exs. 13, 14, 15).   Three witnesses testified: George Kopecky, David Weber, and Robert Weedn.   The bankruptcy court's opinion issued on June 5, 2008.

(*Id.*, Ex. 16).  The bankruptcy court concluded that Weber and Weedn were both credible witnesses, but that Kopecky was "less than credible," citing what it concluded was Kopecky's lack of detailed knowledge of the contracts at issue combined with a "haughty self-assuredness," "hubris," and "evasiveness."  (*Id.*, Ex. 16 at 14).  The bankruptcy court was clearly angered by Kopecky's business tactics in refusing to withdraw the Memorandum of Contract based on a 2001 contract (that the court found was clearly invalid) while using the Memorandum of Contract to try to get Decker Oaks to agree on a favorable purchase price for the Saratoga Springs lots.

The bankruptcy court concluded that the 2001 Saratoga Springs contract was never valid or enforceable because of defects in contract formation, including the absence of "Exhibit A" describing the property that was the subject of the contract and the fact that terms had been changed after the other party had signed.  The bankruptcy court concluded that Royce Homes was entitled to the return of the $25,000 in earnest money under that contract. (*Id.*, Ex. 16 at 16–26).  The court also found that Royce Homes's filing of and refusal to remove the Memorandum of Contract constituted slander of title and tortious interference with the Bryant investors' existing contract.  (*Id.*, Ex. 16 at 27–35).  The court concluded that Royce Homes knew of the Bryant investors' contract when it refused to remove the Memorandum of Contract; that at that time, Royce Homes did not have a reasonable belief that it maintained any interest in Saratoga Springs; and that Royce Homes's refusal to remove the Memorandum of Contract was intended to induce the Bryant investors to terminate their contract to purchase Saratoga Springs.  The bankruptcy court concluded that the Bryant

25

investors terminated their contract because of Royce Homes's refusal to remove the Memorandum of Contract.

The bankruptcy court concluded that Decker Oaks had not established tortious interference with a prospective contract because the Bryant investors' contract was an existing contract and because Decker Oaks had failed to provide sufficient evidence of any specific potential sale besides the Bryant investors' earnest money contract. (*Id.*, Ex. 16 at 35–39). The court also denied Decker Oaks's claim for common-law fraud, concluding that Decker Oaks could not show that Royce Homes made a misrepresentation with the intent that Decker Oaks act on it, and could not show detrimental reliance. (*Id.*, Ex. 16 at 39–42).

The bankruptcy court held that although Decker Oaks had proven slander of title, it had failed to present evidence of damages. The court cited the Texas rule for determining damages for slander of title. "A plaintiff may recover the amount he would have realized from the sale less the amount for which he could have sold . . . at the time of the trial with the cloud removed." *See Duncan Land & Explor., Inc. v. Littlepage*, 984 S.W.2d 318, 333 (Tex. App.–Fort Worth 1998, pet. denied). The bankruptcy court held that because the property had been foreclosed on before the trial, damages for the slander of title – the filing of and refusal to remove the Memorandum of Contract – would be determined by "the difference between the value of contract with the Bryants and the value of the Saratoga Springs property on or near the date of foreclosure." (Bkrtcy Rec., Ex. 16 at 57). There was no evidence of the value of Saratoga Springs near the date of foreclosure. The bankruptcy court stated that it would hold a separate hearing to allow Decker Oaks to present such evidence. (*Id.*). Decker Oaks,

however, declined to do so.  (*Id.*, Ex. 19).  The bankruptcy court therefore held that it could

not award any damages for slander of title.  (*Id.*, Ex. 20 at 2).  Neither party appealed from

the bankruptcy court's rulings on the slander of title claim.

The bankruptcy court did award damages for Royce Homes's tortious interference with

an existing contract.  The only evidence of an existing contract was the Bryant investors'

earnest money contract.  The bankruptcy court concluded that Royce Homes was liable to

Decker Oaks for $2,309,500 in special and consequential damages resulting from Royce

Homes's tortious interference with the Bryant investors' contract, plus 5% prejudgment and

5% postjudgment interest.  The court first held that Decker Oaks was entitled to receive the

profits it lost when the Bryant investors cancelled their contract to purchase the subdivision.

The lost profits were $809,500, calculated by subtracting the proposed contract price of

$4,499,500 from the mortgage debt of $3,690,000.   The mortgage debt consisted of a

$2,650,000 mortgage with Capital One and a $1,040,000 mortgage with Traditions Bank.

The bankruptcy court held that Royce Homes's experience in the real estate business

made it aware that after the Bryant investors cancelled their contract, the continued refusal

to remove the Memorandum of Contract would cause "detrimental effects" on Decker Oaks's

financing of Saratoga Springs, which would in turn cause Decker Oaks to encounter cash-flow

problems, which would eventually lead to foreclosure on Saratoga Springs and the potential

for a deficiency judgment.  (*Id.*, Ex. 16 at 60).  As a result, the bankruptcy court held that

Royce Homes was also liable to pay $1,500,000, the amount of the deficiency remaining after

the second foreclosure on the property in March 2007, over a year after the Bryant investors

terminated their earnest money contract.  (*Id.*, Ex. 16 at 57–63).  The $1.5 million was awarded as consequential damages from Royce Homes's tortious interference with the Bryant investors' contract, not for slander of title.

The bankruptcy court also determined that Royce Homes materially breached the Villages of Decker Oaks contract by failing to purchase nine out of the eighty lots specified in the amended contract.  The court concluded that Decker Oaks was entitled to retain the $62,000 in earnest money as liquidated damages.  (*Id.*, Ex. 16 at 42–56).

Royce Homes appeals the bankruptcy court's conclusion that Royce Homes tortiously interfered with the Bryant investors' contract by filing and refusing to remove the Memorandum of Contract from the real property records.  Royce Homes asserts that the bankruptcy court erred on a number of grounds, including that the Bryant offer was not a contract subject to interference; there was no evidence that the Bryant investors were "ready, willing and able" to purchase the property; and there was no evidence that Royce Homes's refusal to remove the Memorandum of Contract proximately caused the Bryant investors' withdrawal of their option contract.  Royce Homes also asserts that the bankruptcy court erred in finding that Kopecky did not have a "reasonable belief" that the 2001 contract with Decker Oaks to purchase lots in Saratoga Springs was a valid contract; that the refusal to remove the Memorandum of Contract was an affirmative act intended to interfere with the Bryant investors' contract or to induce the Bryant investors to terminate their contract; that Royce Homes was aware of the effects that the Memorandum of Contract would have on Decker Oaks's financing of Saratoga Springs; and that the March 2007 foreclosure on the Saratoga

Springs property and resulting deficiency were foreseeable in February 2006, when the alleged tortious interference with the Bryant investors' contract occurred.   Royce Homes argued that the bankruptcy court erred in including the foreclosure deficiency in the consequential damages awarded.  Decker Oaks cross appeals on one ground, arguing that if this court concludes that the Bryant investors' contract was not an existing contract subject to interference, it was a prospective contract with which Royce Homes tortiously interfered.

Royce Homes also appeals the bankruptcy court's finding that Royce Homes's failure to purchase nine of the required 80 lots in Section I materially breached the Villages of Decker Oaks contract.  Royce Homes argues that it is entitled to the return of the $62,000 in earnest money deposited to purchase lots in Section II, which the bankruptcy court awarded as liquidated damages for the contract  breach.

## II.    The Standard of Review

A district court reviewing a bankruptcy court's judgment acts as an appellate court. *In re Webb*, 954 F.2d 1102, 1103 & n.1 (5th Cir. 1992).  Conclusions of law are reviewed *de novo*.  *In re Killebrew*, 888 F.2d 1516, 1519 (5th Cir. 1989); *In re Argo Financial, Inc.*, 337 F.3d 516, 521–22 (5th Cir. 2003).  A finding of fact may be disregarded only if it is clearly erroneous.  *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003).  "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or th[e] court is convinced that the findings are against the weight of credible testimony."  *Bd. of Trustees New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008).

In reviewing findings of fact, the district court must not weigh the evidence anew but rather determine whether the evidence supports the bankruptcy court's findings and set them aside only if there is a "definite and firm conviction that a mistake has been committed." *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003); *see also In re Perry*, 345 F.3d 303, 308–09 (5th Cir. 2003); *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003). If the bankruptcy court's finding is plausible in light of the record viewed as a whole, the district court should not reverse even if it would have weighed the evidence differently. *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258 (5th Cir. 2006). "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). The bankruptcy judge's opportunity to make first-hand credibility determinations entitles its assessment of witness testimony to particular deference. *Id.; see also Firstbank v. Pope*, 141 B.R. 115, 118 (E.D. Tex. 1992), *aff'd*, 979 F.2d 1534 (5th Cir. 1992).

## III.   Analysis

### A.   The Saratoga Springs Contract

To establish tortious interference with an existing contract, a plaintiff must show: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 694 (N.D. Tex. 2008) (applying Texas law). The bankruptcy court concluded that Royce Homes

tortiously interfered with the Bryant investors' earnest money contract to purchase the Saratoga Springs subdivision and that this interference proximately caused the Bryant investors to withdraw their contract.  The bankruptcy court held Royce Homes liable for the loss of the profits that Decker Oaks could have made had the Bryant investors purchased the property.  The court also held that Royce Homes was liable for the deficiency judgment remaining after the mortgage lender foreclosed on the property a year later, as consequential damages for the tortious interference with the Bryant investors' contract.  This court concludes that the bankruptcy court erred in finding that Royce Homes's refusal to remove the Memorandum of Contract from the property records in January and February 2006 proximately caused the Bryant investors to terminate their contract.  This court also concludes that the bankruptcy court erred in holding Royce Homes liable for the deficiency judgment following the March 2007 foreclosure as damages resulting from the February 2006 tortious interference with the Bryant investors' contract.  The damages awarded for tortious interference with an existing contract must be reversed.

### 1. Whether Royce Homes's Interference Proximately Caused the Bryant Investors to Cancel their Earnest Money Contract

The bankruptcy court concluded that Royce Homes's failure to remove the Memorandum of Contract from the Harris County property records was "a primary or, at a minimum, a substantial factor in defeating the [Bryant investors'] contract" and was therefore a proximate cause of their decision to cancel that contract.  (Bkrtcy Rec., Ex. 16 at 35).  Royce

Homes argues that the evidence in the record does not support this proximate cause finding and that it was clearly erroneous. This court agrees.

In its opinion, the bankruptcy court cited relied on three pieces of evidence to support its conclusion. The first piece was the Bryant investors' contract to purchase the Saratoga Springs subdivision. This evidence showed that the Bryant investors' earnest money contract was an existing contract but shed no light on why it was cancelled. (Docket Entry No. 7, Ex. 29). The second piece of evidence the bankruptcy court cited was Robert Weedn's testimony that he "called [Kopecky] before the contract was terminated" asking him to remove the Memorandum of Contract because it would frustrate the sale of the Saratoga Springs subdivision. (Bkrtcy Rec., Ex. 14 at 156:14–22). This evidence shows that Weedn believed that the Memorandum of Contract would affect a sale but does not explain why the Bryant investors cancelled their contract. The third piece of evidence was a copy of the letter that Decker Oaks's attorneys sent to Royce Homes on February 7, 2006. (Docket Entry No. 10, Ex. 29). That letter stated, in relevant part:

> Royce has unlawfully and without justification clouded and encumbered the title of our client to the Subject Property (or at least a substantial part of it), and is causing our client immediate and irreparable injury and damage. . . . Be advised that our client intends to hold Royce liable in damages and for all other costs, losses and expenses they incur or suffer . . . . Such losses could be substantial given that if Royce fails to remove the Memorandum the sale of the Subject Property to a third party will almost undoubtedly not be consummated.

(*Id.*).  This letter again shows that Decker Oaks believed that Royce Homes's refusal to remove the Memorandum of Contract would frustrate the sale, but does not show why the Bryant investors decided to cancel their contract.

The bankruptcy court did not cite in its proximate cause findings Steve Bryant's letter cancelling the Bryant investors' earnest money contract to purchase the Saratoga Springs property.  That letter, which was in evidence, stated in relevant part:

> I will continue working with my group on this opportunity but rather than object to the cloud on the title from the Royce Homes 2001 contract to get more time on my feasibility period, I would rather terminate the contract, free you up to pursue other purchasers and if the property is still available when my group is ready I will discuss a new contract with you at that time.

(Docket Entry No. 7, Ex. 33).  The bankruptcy court's findings of fact specifically recognized that "[t]he Letter of Cancellation did not raise a specific objection to the state of the title to Saratoga Springs."  The court also recognized that "the Bryants never formally raised an objection to the realty's title such that Decker Oaks's right to cure any title problems would become available."  (Bkrtcy Rec., Ex. 16 at 8–9).  The bankruptcy court also did not cite the email that Bryant sent to Weedn the day after the letter of cancellation.  In the email, Bryant stated:  "Thank you for the opportunity to pursue this property and I very much enjoyed meeting you both.  I intend to continue working with my group and hope to be back in touch with you soon."  (Docket Entry No. 7, Ex. 33). The email makes no reference to the Memorandum of Contract or to any concern about the title.

To prove proximate causation in a tortious interference claim, the plaintiff must establish both cause-in-fact and foreseeability. *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.–Houston [1st Dist.] 2006, pet. denied). "An act or omission is a cause-in-fact of an injury if it was a substantial factor in causing the injury and without the act or omission, the harm would not have occurred." *Smith v. Mohawk Mills, Inc.*, 260 S.W.3d 672, 675–76 (Tex. App.–Dallas 2008, no pet.). Establishing cause-in-fact "requires that the plaintiff bring forth sufficient facts so that the evidence, and logical inferences drawn from the evidence, support a reasonable probability that the defendant's acts or omissions were a substantial factor in bringing about an injury." *Richardson-Eagle*, 213 S.W.3d at 474. There can be no liability for tortious interference with contract "where the obligor would have repudiated the obligation in any event." 47 Tex. Jur. 3d INTERFERENCE WITH CONTRACTS, ETC. § 11 (2009).

The bankruptcy court's finding of proximate cause is not supported by substantial evidence. None of the evidence the bankruptcy court cited in support of its finding is evidence that Royce Homes's refusal to remove the Memorandum of Contract proximately caused the Bryant investors to cancel their earnest money contract within the 30-day feasibility period. The evidence that Decker Oaks told Royce Homes that the Memorandum of Contract would "almost certainly" stop a sale is evidence that this result was foreseeable but is not evidence that it was the cause in fact of the Bryant investors' decision to cancel the contract. The cancellation letter that Steve Bryant himself wrote provides no support for the finding that the Memorandum of Contract was the primary or a substantial cause of the Bryant

34

investors' decision to cancel the contract within the 30-day feasibility period.  The letter suggests, at most, that the Bryant investors viewed the cloud on title as a means through which they could have extended the feasibility period.  In the letter, Steve Bryant wrote:  "[R]ather than object to the cloud on the title from the Royce Homes 2001 contract *to get more time on my feasibility period*, I would rather terminate the contract, free you up to pursue other purchasers and if the property is still available *when my group is ready* I will discuss a new contract with you at that time."  (Docket Entry No. 7, Ex. 33 (emphasis added)).  There is no dispute, and the bankruptcy court specifically found, that the Bryant investors never filed an objection to the cloud on title.  The evidence shows that the Bryant investors chose not to do so, despite their contractual right to require Decker Oaks to cure the exception and to extend the feasibility period to cancel without penalty.  Instead, Bryant told Decker Oaks that the investor group was not "ready" to proceed with the sale.  There is no basis to conclude that their lack of readiness was related to the cloud on title.  This conclusion is supported by the email that Bryant sent to Weedn the day after the letter of cancellation, stating "[t]hank you for the opportunity to pursue this property and I very much enjoyed meeting you both.  I intend to continue working with my group and hope to be back in touch with you soon."  (*Id.*).

Decker Oaks argues that this court should affirm the proximate cause finding on the basis of testimony that is part of the record but was not cited by the bankruptcy court to support its finding of tortious interference.  Weedn testified at the bench trial that Bryant had told him "that he couldn't buy [the Saratoga Springs subdivision] or wouldn't buy it with this title defect."  (Bkrtcy Rec., Ex. 14 at 144–45).  Weedn also testified that Bryant had told him

35

that his group would only be interested in the property if the title deficiency created by the Memorandum of Contract was removed.  Weedn testified: "[Bryant] called us up and . . . [said] there was a Memorandum of Contract or a cloud on the title.  He was going to terminate the contract but he was – continued to be interested in the property and he'd be working with his group if the title objection ever got off the title."  (*Id.*, Ex. 15 at 9–10).  Royce Homes did not raise a hearsay objection.

Weedn's testimony about the out-of-court statements made to him by Bryant was "offered in evidence to prove the truth of the matter asserted" in those statements.  FED. R. EVID. 801(c).  Decker Oaks's counsel acknowledge that Weedn's testimony was hearsay and do not argue that the testimony falls within a hearsay exception or exclusion.  Because Royce Homes did not contemporaneously raise a hearsay objection, however, the objection is considered waived,[1] and Weedn's hearsay testimony "'may be considered . . . for such probative value as it may have,'" unless such consideration would amount to plain error.  *Peaches Entm't Corp. v. Entm't Repertoire Assocs., Inc.*, 62 F.3d 690, 694 (5th Cir. 1995); *see also Whitehead v. Food Max of Mississippi, Inc.,* 163 F.3d 265, 274 (5th Cir. 1998); FED. R. EVID. 103(d).

---

[1] *See Emplanar, Inc. v. Marsh*, 11 F.3d 1284, 1297 n.17 (5th Cir. 1994) ("The Contractors now contend that this paper is hearsay, and cannot be relied upon by the district court in rendering summary judgment.  However, they did not raise this hearsay objection below, so the error, if any, is waived."); *N.L.R.B. v. Cal-Maine Farms, Inc.*, 998 F.2d 1336, 1343 (5th Cir. 1993) ("Cal-Maine argues that the [administrative boards] erred in giving any weight to the two employees' claims because their testimony was hearsay. . . . [But] Cal-Maine did not object . . . on hearsay grounds at the administrative hearing.  Thus, their hearsay objection is waived.").

There are four prerequisites to a finding that considering this hearsay testimony would amount to plain error: "(1) an error; (2) that is clear and obvious under current law; (3) that affects the defendant's substantial rights; and (4) that would seriously affect the fairness, integrity or public reputation of judicial proceedings if left uncorrected." *Tompkins v. Cyr,* 202 F.3d 770, 779 (5th Cir. 2000) (internal citations and quotations omitted). The methodology for analyzing for plain error in the criminal law context applies to the civil law context as well. *Id.* at 779 n.2*; Highlands Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 27 F.3d 1027, 1032 (5th Cir. 1994).

The first two criteria are satisfied here. Under Federal Rule of Evidence 801(c), hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Weedn's testimony about what he was told by Bryant was hearsay and its admission was an error that was clear and obvious under current law.

If this hearsay testimony is relied upon to support the bankruptcy court's conclusion that Royce Homes's refusal to withdraw the Memorandum of Contract proximately caused the Bryant investors to cancel their earnest money contract, the third prong is of the plain error analysis is implicated. The evidence would have an impact on Royce Homes's substantial rights because it would affect the outcome. *Anderson v. Siemens,* 335 F.3d 466, 472 (5th Cir. 2003); *Tompkins v. Cyr,* 202 F.3d at 779; *United States v. Adkism*, 180 F.3d 264, 1999 WL 301305, at *9 (5th Cir. Apr. 26, 1999) (unpublished). When the only evidence supporting a finding or judgment is admitted through plain error, there is an impact on the party's

37

substantial rights.  In *Anderson*, for example, the defendant failed to lodge an appropriate

hearsay objection to the introduction of the plaintiff's death certificate, which the trial court

erroneously admitted.  The death certificate was the only piece of evidence in the case that

causally linked the plaintiff's death to the plaintiff's stroke induced by the defendant's product

two years earlier.  335 F.3d at 473–75.  In reversing, the Fifth Circuit stated:

> The death certificate was, in essence, the only evidence linking
> Decedent's 1996 stroke to his death in 1998.  Petitioner failed to
> present the testimony of the certifying physician – or any other
> expert medical witness – to support the death certificate's
> conclusion that the immediate cause of Decedent's death,
> pneumonia, was "due to" (or a "likely consequence of") his 1996
> stroke.  Thus, insofar as [this suit] sought to recover damages for
> Decedent's death, the critical lynchpin holding together
> Petitioner's case was the erroneously-admitted death certificate's
> unsupported conclusion on the cause of death.

*Id.* at 473–74.  The court concluded that because the death certificate was the sole basis in the

record for determining that the stroke was the "producing cause" of the plaintiff's death, the

erroneous admission of the death certificate had "impacted the outcome of the trial" and was

plain error that required reversal.  *Id.* at 474–75.  By contrast, in *Peaches Entertainment*, 62

F.3d at 694, the Fifth Circuit concluded that the district court did not commit plain error in

admitting unobjected-to hearsay testimony about the size of the defendant's trade area because

there was other admissible evidence supporting the court's findings and conclusions and the

hearsay testimony "was not the sole basis" for the injunction the court issued.

The bankruptcy court's opinion does not refer to Weedn's hearsay testimony as support

for the proximate cause finding.  The evidence that the bankruptcy court did explicitly refer

to in explaining the proximate cause finding does not support the finding.  Instead, that

evidence shows that it was foreseeable that the Memorandum of Contract could frustrate a potential sale, but does not show that the Memorandum of Contract was the cause-in-fact of the Bryant investors' decision to cancel their earnest money contract. The evidence in the record that the bankruptcy court did not refer to – the letter and email from Bryant to Weedn – do not support the finding that the Memorandum of Contract proximately caused the Bryant investors' decision to cancel the earnest money contract. To the contrary, the letter and email show that the Bryant investors were simply not ready to proceed with the sale. They were so unready that they did not even take advantage of the opportunity afforded by the title exception to object and obtain more time on the feasibility period.

The only evidence supporting the conclusion that the Memorandum of Contract caused the Bryant investors to cancel the contract was Weedn's testimony that Bryant told him that "he couldn't buy it or wouldn't buy it with this title defect." This testimony is inconsistent with the other evidence, which shows that the Bryant investors cancelled the contract because they were not ready to purchase the property, and is the only in evidence in the record to show cause in fact. Because Weedn's testimony as to Bryant's out-of-court statement is the only evidence showing cause in fact, reliance on the testimony would necessarily affect the outcome, satisfying the third prong of the plain error analysis. *Anderson*, 355 F.3d at 473–75.

Plain error affecting substantial rights does not mandate reversal. Such a result is only appropriate if the error would seriously affect the fairness, integrity or public reputation of judicial proceedings if left uncorrected. The bankruptcy court did not cite the hearsay testimony to support the proximate cause finding, but the evidence the bankruptcy court relied

39

on does not provide the necessary support.  The only evidence that supports the finding and conclusion that Royce Homes's refusal to withdraw its Memorandum of Contract proximately caused Decker Oaks to lose the Bryant investors' earnest money contract was hearsay and its admission plainly erroneous.  To allow that finding to stand based solely on the plainly erroneous admission of hearsay testimony would affect the fairness and integrity of these proceedings.

The proximate cause finding cannot stand.  Because proximate cause is an element of tortious interference, the bankruptcy court's finding of tortious interference is reversed. Because this court's reversal turns on causation and does not depend whether or not the 2001 Saratoga Springs contract was an existing or prospective contract subject to interference, Decker Oaks's argument on cross-appeal that this court should hold that Royce Homes tortiously interfered with a prospective contract with the Bryant investors is denied as moot.

### 2.   Whether the $1.5 Million Deficiency Judgment was Properly Awarded as Consequential Damages for the Tortious Interference with the Bryant Investors' Contract

There is an even greater problem with the bankruptcy court's finding that the $1.5 million deficiency remaining in March 2007, after the second of two foreclosures, was consequential damages resulting from Royce Homes's tortious interference in January and February 2006 with the Bryant investors' contract to purchase the Saratoga Springs subdivision.  (Bkrtcy Rec., Ex. 16 at 61).  The bankruptcy court justified this result by finding that Royce Homes was aware that the continued presence of the Memorandum of Contract *after* the Bryant investors cancelled their contract would have detrimental effects on Decker

Oaks's financing of Saratoga Springs, eventually leading to cash-flow problems, foreclosure, and the potential for a deficiency judgment.  (*Id*., Ex. 16 at 60).  Although the bankruptcy court held Royce Homes liable for the $1.5 million deficiency judgment as consequential damages of Royce Homes's January and February 2006 tortious interference with the Bryant investors' contract to purchase Saratoga Springs, the court inconsistently explained that the March 2007 foreclosure and deficiency judgment were the eventual result of Royce Homes's continued refusal to remove the Memorandum of Contract *after* the Bryant investors' contract was terminated.  Under this explanation, the only basis for awarding Decker Oaks damages for the deficiency judgment would be slander of title, not the February 2006 tortious interference with the Bryant investors' contract.  But the bankruptcy judge properly declined to award damages for slander of title and there is no appeal from that part of the judgment.

Even if the record supported the finding that Royce Homes's refusal to remove the Memorandum of Contract proximately caused the Bryant investors' decision to cancel their earnest money contract, there is no support for the finding that the damages resulting from this tortious interference included the deficiency judgment remaining after the foreclosures over a year later.  "Consequential damages . . . result naturally, but not necessarily, from the defendant's wrongful acts."  *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997); *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex. 1995).  They "need not be the usual result of the wrong, but must be foreseeable and must be directly traceable to the wrongful act and result from it."  *Arthur Andersen*, 945 S.W.2d at 816

41

(internal citation omitted).  "[I]f damages are too remote, too uncertain, or purely conjectural, they cannot be recovered."  *Id.*

There is no basis in the record to support a finding that in February 2006, when Royce Homes refused to remove the Memorandum of Contract from the property records, it was reasonably foreseeable not only that the Bryant investors would decide to cancel their earnest money contract, but also that Decker Oaks would not continue with its plans to construct the subdivision, would be unable to pay its lenders, and foreclosures would result.  Weedn specifically testified that when he met with Kopecky before the Bryant investors' contract fell through, he "didn't know" that the mortgage lenders would stop releasing construction funds because of the Memorandum of Contract, and specifically told Kopecky that Decker Oaks "ha[d] the loans to develop" the subdivision.  (Bkrtcy Rec., Ex. 14 at 149).  Weedn told Kopecky only that the Memorandum of Contract would cause Decker Oaks to lose the Bryant investors' contract.  (*Id.*).  Similarly, the letter sent by Decker Oaks's attorneys to Royce Homes on February 7, 2006 warned that the Memorandum of Contract would stop the sale of the property to a third party.  The letter did not make any reference that the Memorandum would threaten Decker Oaks's ability to draw on construction loans or affect financing to develop the Saratoga Springs property.[2]  (Docket Entry No. 10, Ex. 29).  There is evidence

---

[2]  The letter did contain a more general demand that Royce Homes "(a) immediately terminate and withdraw the Memorandum filed relating to this matter, and (b) cease and refrain from any further actions which will interfere with my client's ownership, use, development, sale or financing of the Subject Property or any part of it."  (Docket Entry No. 10, Ex. 29).  The parties did not address this demand on the record, and the bankruptcy court did not cite it.  This warning appears to be too general, without more, to have put Royce Homes on notice that its failure to remove the Memorandum of Contract would cause the

in the record that Decker Oaks told Royce Homes *after* the loss of the Bryant investors'
contract that the Memorandum of Contract threatened the banks' willingness to provide
financing.  (Bkrtcy Rec., Ex. 14 at 150–52).  But the record does not indicate that in February
2006, either party foresaw that Decker Oaks would suffer foreclosure months later as a result
of the Bryant investors' cancellation of their contract.  The bankruptcy court reasoned that the
foreclosures should have been foreseeable to Royce Homes because it was a sophisticated
entity "with constant involvement in various land transactions." (*Id.*, Ex. 16 at 60).  But there
is no evidence that a sophisticated business entity should have foreseen that the loss of a
single contract for sale would result in foreclosure months later.

Nor is there any basis in the record to support a finding that the November 2006 and
March 2007 foreclosures and resulting deficiency were "directly traceable to the wrongful
act" of tortiously interfering with the Bryant investors' contract in February 2006 by refusing
to remove the Memorandum of Contract or that they "result[ed] from" that act.  The evidence
showed that after the Bryant investors cancelled, Decker Oaks continued to market the lots
to other builders.  Susie Weedn informed Decker Oaks's lenders on March 22, 2006, that she
and Robert Weedn had "met with two additional prospective buyers in attempts to further a
contract." (Docket Entry No. 7, Ex. 35).  Decker Oaks mailed information packets about the
Saratoga Springs property to at least nine prospective purchasers.  (*Id.*, Ex. 44).  The evidence
showed that Decker Oaks received an offer to purchase the Saratoga Springs property from
Tom McDonald, a broker in Conroe, Texas.  (Bkrtcy Rec., Ex. 15 at 12).  The record does not

---

banks to stop releasing construction funds.

indicate why the offer did not culminate in a sale, or whether the Memorandum of Contract played any role.  The evidence showed that Great Western offered to purchase lots in the Saratoga Springs subdivision, and that Great Western both knew of and was not deterred by the Memorandum of Contract.  (Docket Entry No. 7, Ex. 43; Bkrtcy Rec., Ex. 14 at 75).  Royce Homes itself was negotiating to purchase lots in the subdivision.  (Docket Entry No. 7, Ex. 42).  The evidence showed that Decker Oaks continued to assure its lenders of plans to begin construction, well after the loss of the Bryant investors' contract.  (*Id.*, Exs. 35, 40).  None of Decker Oaks's correspondence to its lenders mentioned any problems drawing down on the construction loans.  Even if Royce Homes's February 2006 refusal to remove the Memorandum of Contract from the real property records proximately caused the loss of the Bryant investors' earnest money contract, there is no basis in the record to support a finding that it was reasonably foreseeable to Royce Homes that the loss of this contract would cause foreclosures and a deficiency judgment over a year later or that the foreclosures were "directly traceable" to and resulted from Royce Homes's tortious interference with that contract.

Decker Oaks did not plead or prove that the foreclosures by Traditions Bank in November 2006 and by Capital One in March 2007, and the resulting $1.5 million deficiency on the Capital One loan in March 2007, were proximately caused by Royce Homes's tortious interference with the Bryant investors' contract.  Decker Oaks's First Amended Answer and Counterclaim alleged that Royce Homes's tortious interference with the Bryant investors' contract "prevented the consummation of [the] sale of the Property" and "proximately caused the loss of a specific sale of the Property."  (Bkrtcy Rec., Ex. 6 ¶ 41).  Decker Oaks did plead

losses from the foreclosures as special damages resulting from *all* of Royce Homes's alleged "tortious acts and/or omissions," which included conduct, particularly slander of title, that continued long after the loss of the Bryant investors' contract. But neither the pleadings nor proof provided a basis to conclude that Royce Homes was liable for foreclosures that occurred in November 2006 and March 2007 as a result of tortious interference with an existing contract in February 2006. (*Id.*, Ex. 6 ¶¶ 39–43, 51).

This court's conclusions do not disturb any of the witness credibility determinations made by the bankruptcy court. The only testimony supporting the conclusion that Royce Homes's interference proximately caused the loss of the Bryant investors' contract was from Weedn, whom the bankruptcy judge found credible. This court's determination that Weedn's testimony cannot sustain the bankruptcy court's proximate cause finding does not turn on credibility, but on the fact that his testimony was inadmissible hearsay. Weedn also provided the only testimony relevant to whether the November 2006 and March 2007 foreclosures and deficiency judgment were a foreseeable, direct, and natural result of Royce Homes's February 2006 interference with the Bryant investors' contract. This court's determination that the deficiency did not result from the interference does not turn on Weedn's credibility. Although Weedn testified that he told Kopecky about problems with his lenders and about problems selling the lots because of the continued presence of the Memorandum of Contract, this testimony only pertained to the period after the tortious interference with the Bryant investors'

contract had ended.[3]  This testimony was relevant to damages for the slander of title claim –
which the judge did not award – but not to the tortious interference claim.

The finding of tortious interference with the Bryant investors' earnest money contract
must be reversed.  Even if there were a basis to find tortious interference, the damages could
only include the loss of profits from that contract and could not include the deficiency
judgment from the second of two foreclosures that occurred a year later.  Accordingly, the
bankruptcy court erred in awarding $2,309,500 in damages.

### B.      The Villages of Decker Oaks Contract

The bankruptcy court concluded that there was no ambiguity in the amended Villages
of Decker Oaks contract, (Bkrtcy Rec., Ex. 16 at 42–45), which incorporated by reference the
original 2001 Villages of Decker Oaks contract.  The relevant part of that amended contract
stated:

> 1.      The base purchase price shall be amended to Nineteen
> Thousand dollars ($19,000.00) per lot for Section II.

---

[3]  Robert Weedn's testimony included that in February 2006, after the loss of the
Bryant investors' contract, "[t]he bank ha[d] told me that they're not going to release any
more money on draws," (Bkrtcy Rec., Ex. 14 at 150); in March 2006, "the bank was getting
more and more irritated . . . because as far as they're concerned I'm still legally tied to a 2001
contract," (*id.*, Ex. 14 at 152); in July 2006, "I could not do anything" and the bank would
not be satisfied until the "Memorandum of Contract [was] released," (*id.*, Ex. 14 at 160).
This testimony was also hearsay insofar as it was offered to prove that the Memorandum of
Contract was the cause-in-fact of the lenders' refusal to allow any more draws on the
construction loans.  There is no evidence in the record besides Weedn's testimony as to the
lenders' motives about whether and why the lenders stopped allowing draws on the
construction loans, or why they decided to foreclose.

2.   The 80 lots sold or available for sale in Section I are the complete obligation of the Seller and Purchaser for Section I and is satisfied [sic].

3.   Purchaser shall purchase 60 lots from Section II.

4.   Upon Sellers loan commitment the earnest money is hereby amended to be Five Thousand dollars ($5,000.00) and deposited with Stewart Title until the contract is fulfilled.   At time of Seller Construction Loan Commitment, additional earnest money of Fifty Seven Thousand dollars ($57,000) submitted by form of Letter of Credit shall be conveyed to Stewart Title.

5.   This amendment is subject to the Sellers lender's approval.

This concludes both the Seller's and Purchaser's obligations on all lots in The Village of Decker Oaks subdivision.  All terms and conditions of the Contract of Sale shall remain in effect and shall survive this amendment.

(Docket Entry No. 7, Ex. 56).  The bankruptcy court determined that paragraph 2 of the contract required Royce Homes to complete the purchase of 80 lots.  The court held that the statement in the amended contract that this obligation was "satisfied" did not extinguish Royce Homes's obligation.  (Bkrtcy Rec., Ex. 16 at 44–45).  The court concluded that Royce Homes had breached its obligation to purchase 80 lots and that the breach was material.  (*Id.*, Ex. 16 at 45–47).  The court found that Decker Oaks had provided adequate notice of its intent to terminate the contract, (*id.*, Ex. 16 at 51–52), and accordingly awarded Decker Oaks the $62,000 in earnest money that Royce Homes had deposited under the amended contract as liquidated damages for the breach, (*id.*, Ex. 16 at 49–50).  Royce Homes challenges each of

these findings.  This court reverses on the basis that Decker Oaks did not give Royce Homes notice of this default and an opportunity to cure.

The Villages of Decker Oaks contract contained a cure provision that stated:  "Each party shall be entitled to written notice of any default and shall have sixty (60) days from receipt of such notice to cure such default prior to the exercise of any remedy provided herein."  (Docket Entry No. 7, Ex. 46 § VII).  The parties do not dispute that Royce Homes received its first written notice of default on September 3, 2004.  The letter, from Decker Oaks's counsel, stated that Royce Homes was in default of the amended Villages of Decker Oaks contract because it had not purchased nine of the required 80 lots and because $57,000 in earnest money had not yet been received.  (*Id.*, Ex. 72).  Decker Oaks concedes that the statement about earnest money was in error.  (Bkrtcy Rec., Ex. 15 at 48).  Decker Oaks terminated the contract less than two weeks later, on September 16, 2004.  The termination letter, also sent by Decker Oaks's counsel, identified the ground for termination as Royce Homes's failure to post the earnest money.  The letter did not mention the lots not yet purchased.  (Docket Entry No. 7, Ex. 73).

In concluding that Decker Oaks had provided Royce Homes with adequate written notice of default for failure to purchase the remaining nine lots, the bankruptcy court did not refer to the 60-day cure provision.  The bankruptcy court cited the first part of the cure provision ("Each Party shall be entitled to written notice of any default . . . "), but omitted the rest of the sentence (". . . and shall have sixty (60) days from receipt of such notice to cure such default. . . .").  (Bkrtcy Rec., Ex. 16 at 51).  The failure to consider this requirement,

which would have allowed Royce Homes substantially more time than it was given to cure its alleged failure to purchase the full 80 lots, requires reversal.

Decker Oaks terminated the contract without providing the contractually required cure period. The Villages of Decker Oaks contract stated that if the seller "defaults in performing Seller's obligations hereunder for any reason other than Purchaser's default," the seller is entitled to "receive a return of the Earnest Money then on deposit." (Docket Entry No. 7, Ex. 46 § 5.02). Royce Homes is entitled to the return of the $62,000 in earnest money that secured its obligations under the amended Villages of Decker Oaks contract. Accordingly, the bankruptcy court erred in awarding the $62,000 in retained earnest money to Decker Oaks.

## V.    Conclusion

The bankruptcy court's finding and conclusion that Royce Homes tortiously interfered with the Bryant investors' contract are reversed and the $2,309,500 damages award is vacated. Decker Oaks's cross-appeal is denied as moot. The bankruptcy court's finding and conclusion that Decker Oaks properly terminated the amended Villages of Decker Oaks contract are reversed and the $62,000 in earnest money under that contract is awarded to Royce Homes.

The judgment of the bankruptcy court is reversed and this case is remanded to the bankruptcy court.

SIGNED on March 18, 2009, at Houston, Texas.

_Lee H. Rosenthal_
Lee H. Rosenthal
United States District Judge

49