**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE:  Decker Oaks Development II, Ltd., | § | |
| Debtor | § | |
| _____ | § | |
| | § | |
| ROYCE HOMES, L.P., | § | |
| | § | |
| Appellant, | § | |
| | § | |
| VS. | § | CIVIL ACTION  NO. H-08-2070 |
| | § | Bankruptcy Case:  07-35557 |
| DECKER OAKS DEVELOPMENT II, | § | Adversary Case:  07-3421 |
| LTD., ROBERT WEEDN | § | |
| DEVELOPMENT, LTD., and ROBERT | § | |
| WEEDN, Individually, | § | |
| | § | |
| Appellees. | § | |

**MEMORANDUM AND ORDER**

Appellee Decker Oaks Development II, Ltd. asks this court to reconsider its March 18, 2009

order reversing the bankruptcy court's judgment against the appellant, Royce Homes, L.P.  Decker

Oaks challenges this court's holding that the bankruptcy court erred in finding that Royce Homes

tortiously interfered with Decker Oaks's February 2006 earnest-money purchase contract for a tract

of land and in holding Royce Homes liable for the $1.5 million deficiency remaining after Decker

Oaks's lenders foreclosed on that tract months later.  (Docket Entry No. 39).  Royce Homes has

responded, (Docket Entry No. 40), and Decker Oaks has replied, (Docket Entry No. 41).  Based on

the motion, response, and reply; the record; and the applicable law, this court denies the motion for

rehearing and denies Decker Oaks's motion to amend the judgment.  The reasons are explained

below.

I.      **Background**

The facts of this case are set out in detail in the March 18, 2009 opinion and only summarized here.  Decker Oaks owned raw land north of Houston that it intended to develop as a residential subdivision called "Saratoga Springs."  In 2001, Royce Homes's CFO signed a contract to purchase 196 lots to build single-family homes in Saratoga Springs.  The contract stated that the purchase was to close by June 2002 but that Royce Homes had the option of extending for 90 days.  (Docket Entry No. 7, Ex. 1 § 1.02).  The transaction did not close in 2002, but the parties did not discuss whether the failure to close terminated the contract.  There is evidence in the record that for some time after 2002, both parties behaved as though a valid contract was still in place.

In 2004, Royce Homes filed a Memorandum of Contract in the real property records of Montgomery County, Texas, asserting the 2001 contract with Decker Oaks.  (*Id.*, Ex. 12).  In November 2005, Decker Oaks began marketing lots in Saratoga Springs and searching for a purchaser for the entire subdivision.  Royce Homes learned that Decker Oaks was marketing the property.  On checking the real property records, Royce Homes realized that the Memorandum of Contract had been misfiled; the subdivision was located in Harris County, not Montgomery County.  On January 11, 2006, Royce Homes refiled the Memorandum of Contract in the real property records of Harris County.  (*Id.*).

On January 19, 2006, Decker Oaks received a letter of intent from a group of investors led by Steven C. Bryant to purchase the entire Saratoga Springs subdivision.  (Docket Entry No. 10, Ex. 15).  On January 27, 2006, the Bryant investors and Decker Oaks executed an earnest money contract.  The contract terms included a purchase price of $4,499,500.00 and a 30-day feasibility period.  At any time during the 30-day feasibility period, the Bryant investors had the option to

2

withdraw their offer and recover their earnest money with no penalty.  Under the contract, if the investors objected to a title problem, Decker Oaks would have a 15-day period to cure, extending the feasibility period.  If Decker Oaks failed to cure, the Bryant investors would have 5 days to withdraw their offer and receive their earnest money (less $100).  The proposed purchase was not contingent on third-party financing.  (Docket Entry No. 7, Ex. 29).  Closing the sale would have yielded Decker Oaks $809,500 after paying off the $3,690,000 balance on the two mortgages on the property.  (Bkrtcy Rec., Ex. 16 at 61).

On February 7, 2006, counsel for Decker Oaks sent a letter to Royce Homes demanding the removal of the Memorandum of Contract from the Harris County property records.  The letter stated that the 2001 contract had "lapsed by its very terms."  The letter stated that by filing and refusing to withdraw the Memorandum of Contract, Royce Homes had "unlawfully and without justification clouded and encumbered the title" to the Saratoga Springs subdivision "or at least a substantial part of it" and was causing Decker Oaks "immediate and irreparable injury and damage."  The letter warned that Decker Oaks intended to hold Royce Homes liable for any resulting losses, which "could be substantial given that if Royce fails to remove the Memorandum the sale of the [Saratoga Springs] subdivision will almost undoubtedly not be consummated."  (Docket Entry No. 10, Ex. 29).  Royce Homes refused to remove the Memorandum of Contract from the real property records.

The Bryant investors learned of Royce Homes's Memorandum of Contract during a title search of the Harris County property records.  At the bench trial in the bankruptcy court, Decker Oaks's principal, Robert Weedn, testified that Steve Bryant "called up back and said there's a cloud on the title, there's this memorandum of contract from Royce Homes."  Weedn testified that Bryant told him "that he couldn't buy it or wouldn't buy it with this title defect."  (Bkrtcy Rec., Ex. 14 at

3

144–45).  Weedn testified that Bryant "called us up and . . . [said] there was a Memorandum of

Contract or a cloud on the title.  He was going to terminate the contract but he was—continued to

be interested in the property and he'd be working with his group if the title objections ever got off

the title."  (*Id.*, Ex. 15 at 9–10).  Royce Homes did not raise a hearsay objection to this testimony.

On February 15, 2006, the Bryant investors sent Decker Oaks a letter exercising the

contractual option to terminate the contract to purchase the Saratoga Springs property for no reason

and no penalty.  The letter from Steve Bryant stated:

> This letter shall serve as an official termination of the above-
> referenced contract.
>
> I will continue working with my group on this opportunity but rather
> than object to the cloud on the title from the Royce Homes 2001
> contract to get more time on my feasibility period, I would rather
> terminate the contract, free you up to pursue other purchasers and if
> the property is still available when my group is ready I will discuss
> a new contract with you at that time.

(Docket Entry No. 7, Ex. 33).  Bryant also sent an email to the Weedns the following day that stated:

"Thank you for the opportunity to pursue this property and I very much enjoyed meeting you both.

I intend to continue working with my group and hope to be back in touch with you soon."  (*Id.*).

After the Bryant investors cancelled, Decker Oaks continued to try to get Royce Homes to

remove the Memorandum of Contract.  Robert Weedn testified that in March 2006, he told George

Kopecky, Royce Homes's Director of Land Development, that the Memorandum of Contract had

"stopped the sale" to the Bryant investors and that the lenders for Saratoga Springs had refused to

release construction draws until the Memorandum of Contract was released.  (Bkrtcy Rec., Ex. 14

at 150–52).  Also in March 2006, Robert Weedn's wife, Susie Weedn, informed Saratoga Springs's

lenders that "we received a letter from our potential buyers that they will not purchase this property

unless and until [the Memorandum of Contract] is removed." (Docket Entry No. 7, Ex. 35). Susie Weedn did not refer to any problem drawing down construction funds. Instead, she informed the lenders that "the construction plans needed to commence construction with [the Weedns'] construction company or another are days away from being complete and reviewed by the City of Tomball." (*Id.*). In June 2006, Susie Weedn informed the lenders that Decker Oaks was "prepared to move forward and commence construction." (*Id.*, Ex. 40).

During this period, Decker Oaks continued to market the lots. Susie Weedn informed Decker Oaks's lenders on March 22, 2006, that she and Robert Weedn had "met with two additional prospective buyers in attempts to further a contract." (*Id.*, Ex. 35). Decker Oaks mailed information packets about the Saratoga Springs property to at least nine prospective purchasers. (*Id.*, Ex. 44). The evidence showed that Decker Oaks received an offer to purchase the Saratoga Springs property from Tom McDonald, a broker in Conroe, Texas. (Bkrtcy Rec., Ex. 15 at 12). The record does not indicate why the offer did not culminate in a sale or that the Memorandum of Contract played any role. The evidence also showed that in July 2006, a developer called Great Western Land & Recreation Inc. offered to purchase lots in the Saratoga Springs subdivision, and that Great Western both knew of, and was not deterred by, the Memorandum of Contract. (Docket Entry No. 7, Ex. 43; Bkrtcy Rec., Ex. 14 at 75). Royce Homes itself was negotiating to purchase lots in the subdivision. (Docket Entry No. 7, Ex. 42). The evidence showed that Decker Oaks continued to assure its lenders that it was ready to begin construction, long after the loss of the Bryant investors' contract. (*Id.*, Exs. 35, 40). None of Decker Oaks's correspondence to its lenders mentioned any problems drawing down on the construction loans.

5

Ultimately, Decker Oaks did not sell or develop the Saratoga Springs subdivision or any lots in it.  One of the lenders foreclosed in November 2006; the other foreclosed in March 2007.  A $1.5 million deficiency remained as a result of the second foreclosure.  (Bkrtcy Rec., Ex. 14 at 152–53, 165–66).

Decker Oaks has moved to amend this court's judgment that the bankruptcy court clearly erred in concluding that the Memorandum of Contract caused the Bryant investors to terminate their earnest money contract, amounting to tortious interference.  Decker Oaks also moves to amend this court's judgment that the bankruptcy court clearly erred in concluding that the $1.5 million deficiency judgment was a foreseeable consequence of Royce Homes's interference with the Bryant investors' earnest money contract.

## II.     Legal Standard

### A.       A Motion to Amend a Judgment

A motion to amend a judgment arises under Federal Rule of Civil Procedure 59(e).  A Rule 59(e) motion "calls into question the correctness of a judgment."  *Templet v. Hydrochem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (citing *In re TransTexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)).  "A motion to alter or amend the judgment under Rule 59(e) 'must clearly establish either a manifest error of law or fact or must present newly discovered evidence' and 'cannot be used to raise arguments which could, and should, have been made before the judgment issued.'" *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003) (quoting *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)).  Relief is also appropriate when there has been an intervening change in the controlling law.  *Schiller v. Phys. Res. Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003). The Fifth Circuit warns that altering, amending, or reconsidering a judgment under Rule 59(e) is an

extraordinary remedy that courts should use sparingly. *Templet*, 367 F.3d at 479; *see also* 11 CHARLES A. WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2810.1, at 124 (2d ed.1995). Because granting a Rule 59(e) motion is such an extraordinary remedy, the Rule 59(e) standard "favors denial of motions to alter or amend a judgment." *S. Constr. Group, Inc. v. Dynalectric Co.*, 2 F.3d 606, 611 (5th Cir. 1993).

### B.      Review of a Bankruptcy Court Judgment

A district court reviewing a bankruptcy court's judgment acts as an appellate court. *In re Webb*, 954 F.2d 1102, 1103 & n. 1 (5th Cir. 1992). Conclusions of law are reviewed de novo. *In re Killebrew*, 888 F.2d 1516, 1519 (5th Cir. 1989); *In re Argo Fin., Inc.*, 337 F.3d 516, 521–22 (5th Cir. 2003). A finding of fact may be disregarded only if it is clearly erroneous. *In re Barron*, 325 F.3d 690, 692 (5th Cir. 2003). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or th[e] court is convinced that the findings are against the weight of credible testimony." *Bd. of Trustees New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Gabriel, Roeder, Smith & Co.*, 529 F.3d 506, 509 (5th Cir. 2008).

In reviewing findings of fact, the district court must not weigh the evidence anew but rather determine whether the evidence supports the bankruptcy court's findings and set them aside only if there is a "definite and firm conviction that a mistake has been committed." *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003); *see also In re Perry*, 345 F.3d 303, 308–09 (5th Cir. 2003); *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003). If the bankruptcy court's finding is plausible in light of the record viewed as a whole, the district court should not reverse even if it would have weighed the evidence differently. *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254,

7

258 (5th Cir. 2006).  "'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'"  *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).  The bankruptcy judge's opportunity to make first-hand credibility determinations entitles its assessment of witness testimony to particular deference.  *Id.*; *see also Firstbank v. Pope*, 141 B.R. 115, 118 (E.D.Tex. 1992), *aff'd*, 979 F.2d 1534 (5th Cir. 1992).

## III.    Analysis

### A.    The Termination of the Bryant Investors' Earnest Money Contract

Decker Oaks contends that this court erred in concluding that there was no competent record evidence supporting the bankruptcy court's finding that Royce Homes's Memorandum of Contract on the Saratoga Springs subdivision proximately caused the Bryant investors to cancel the earnest money contract.  Decker Oaks also argues that this court erred in concluding that consideration of Robert Weedn's hearsay testimony that the Memorandum of Contract caused the Bryant investors to cancel would be plain error.  Decker Oaks also seeks to introduce two documents that were not part of the record on appeal that Decker Oaks contends provide further evidence that the Memorandum of Contract caused the Bryant investors to cancel.

To establish tortious interference with an existing contract, a plaintiff must show: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 553 F. Supp. 2d 680, 694 (N.D. Tex. 2008). "Proximate cause includes two components:  cause-in-fact and foreseeability."  *Columbia Rio*

8

*Grande Healthcare, L.P. v. Hawley*, --- S.W.3d ---, 2009 WL 1567176, at *6 (Tex. 2009); *LMB, Ltd. v. Moreno*, 201 S.W.3d 686, 688 (Tex. 2006). "The test for cause-in-fact, or 'but-for' causation, is whether (1) the act or omission was a substantial factor in causing the injury and (2) without the act or omission the harm would not have occurred." *LMB*, 201 S.W.3d at 688; *see also Smith v. Mohwak Mills, Inc.*, 260 S.W.3d 672, 675–76 (Tex. App.–Dallas 2008, no pet.); *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 474 (Tex. App.–Houston [1st Dist.] 2006, pet. denied) ("The proximate-cause tests for cause-in-fact and foreseeability apply to claims of tortious interference."). The party alleging tortious interference has the burden of proving each element of the claim. *Dunn v. Calahan*, No. 03-05-00426, 2008 WL 524886, at *3 (Tex. App.–Austin Dec. 17, 2008, pet. denied).

### 1.     The Nonhearsay Evidence in the Record on Appeal

The bankruptcy court cited three pieces of evidence to support its conclusion that the Memorandum of Contract proximately caused the Bryant investors to cancel the earnest money contract. The first piece of evidence was the Bryant investors' earnest money contract to purchase the Saratoga Springs subdivision. (Docket Entry No. 7, Ex. 29). The second piece of evidence was Robert Weedn's testimony that he "called [Kopecky] before the contract was terminated" asking him to remove the Memorandum of Contract because it could frustrate a sale of Saratoga Springs. (Bkrtcy. Rec., Ex. 14 at 156). The third piece of evidence was a February 7, 2006 letter from Decker Oaks's attorney to Royce Homes warning that the Memorandum of Contract "clouded and encumbered the title" to Saratoga Springs and was "causing [Decker Oaks] immediate and irreparable injury and damage." (Docket Entry No. 10, Ex. 29).

9

Decker Oaks does not dispute this court's conclusion that these three pieces of evidence—which show that Decker Oaks believed that the Memorandum of Contract would threaten the sale, but provide no evidence as to the Bryant investors' reasons[1]—were insufficient to support the conclusion that the Memorandum of Contract was the proximate cause of the Bryant investors' decision to terminate the earnest money contract.  Decker Oaks contends, however, that Steve Bryant's cancellation letter, which the bankruptcy court did not cite in its findings and conclusions, provides sufficient evidence of proximate cause.

Steve Bryant's February 15, 2006 letter stated, in relevant part:

> I will continue working with my group on this opportunity but rather than object to the cloud on the title from the Royce Homes 2001 contract to get more time on my feasibility period, I would rather terminate the contract, free you up to pursue other purchasers and if the property is still available when my group is ready I will discuss a new contract with you at that time.

(Docket Entry No. 7, Ex. 33).  Decker Oaks argues that "the very act of entering into a contract for Saratoga Springs indicates that the Bryants were 'ready' to purchase the property"; that the earnest money contract was "not contingent on third-party financing"; and that "[t]he only matter left undone was the performance of a title search on the property." (Docket Entry No. 39 at 9).  Decker Oaks urges that the letter "reflects a practical disinclination to become involved in a third-party dispute that showed little chance of resolution in the near future."  (*Id.* at 10).  Decker Oaks also argues that the timing of the cancellation—six days after the Bryant investors received notice of the

---

[1]Evidence submitted by Decker Oaks for the first time on appeal shows that the letter from Decker Oaks's lawyers to Royce Homes was sent two days *before* the Bryant investors learned of the title defect on February 9, 2006.  The letter from Decker Oaks's lawyers could not have been a response to, or the result of, any threat by the Bryant investors to terminate the contract.  (Docket Entry No. 39, Ex. 31).

Memorandum of Contract—supports an inference that the cancellation was motivated by the Memorandum of Contract.  (*Id.* at 6).

Decker Oaks's arguments about Bryant's letter do not provide a basis for amending the judgment.  The letter does not state that the Bryant investors were terminating the contract because of the Memorandum of Contract.  To the contrary, the letter says that the Bryant investor group was not ready to go forward with the purchase.  The letter states that the Bryant investors considered but decided not to raise a title objection based on the Memorandum of Contract to obtain more time on the feasibility period.  The letter states that Steve Bryant would "continue working with [his] group on this opportunity" and if the property did not sell and was available when his group was "ready," he would discuss a new contract with Decker Oaks at that time.  This is consistent with the email Bryant sent to the Weedns the following day, stating that Bryant intended to continue working with his investor group and hoped "to be back in touch with you soon."  The letter and email make it clear that Bryant had work to do before his group was ready to proceed with the purchase of the subdivision, not that the group was ready if the title issue was resolved.

Decker Oaks contends that the Bryant investors were "ready," aside from the title search, to proceed with the sale, but there is no evidence in the record to support this conclusion.  Although the earnest money contract was not contingent on securing third-party financing, Decker Oaks ignores the fact that financing is not the only "feasibility" issue that the potential buyer of a large, undeveloped residential real estate tract might need to consider.  And Steve Bryant's termination letter and email do not support the inference that his investor group was ready to proceed as soon as the title issue was resolved.

11

Decker Oaks also argues that there was no reason given in the correspondence between the Bryant investors and Decker Oaks for terminating the earnest money contract other than the Memorandum of Contract, and that therefore, "all evidence points to the Memorandum of Contract" as the reason for termination.  (Docket Entry No. 39 at 10).  But this is inaccurate.  Bryant's letter did not state that the Memorandum of Contract was the reason for termination.  Bryant referred to the Memorandum of Contract only in the context of rejecting it as a means of gaining more time on the feasibility period.  Decker Oaks contends that Bryant's letter reflects a desire to avoid a protracted title conflict, but this is speculation.  The letter does not state, as it easily could have, that Bryant would be back in contact as soon as the title issue cleared.  The letter instead states that the Bryant investors considered objecting to the title but decided not to do so.  The letter states that the Bryant investors decided not to invoke the 15-day period to give Decker Oaks a chance to clear the title issue.  The letter does not ask any questions about the title issue, including whether it would be difficult or easy to resolve.  Instead, the letter states only that if the property was available at some indefinite time in the future when the investors were ready to proceed, Bryant would discuss a new contract.  The letter supports an inference that the group was not ready to proceed but might be sometime in the future.  As a result, there was no reason to give Decker Oaks a chance to resolve the title issue arising from the Memorandum of Contract within an extended feasibility period.

Decker Oaks's argument as to the timing of the cancellation is also not persuasive.  The cancellation came six days after learning of the title defect on February 9, 2006, but the title defect notice itself came over one week after the earnest money contract was signed.  The Bryant investors' feasibility period was only thirty days.  Any cancellation within the contractual feasibility period would by necessity have been temporally close to notice of the title defect.

12

It was Decker Oaks's burden to the prove the proximate cause element of its tortious interference with existing contract claim. *Dunn v. Calahan*, 2008 WL 5264886, at *3. That required Decker Oaks to prove by admissible evidence that the Memorandum of Contract was the but-for cause of the Bryant investors' decision to terminate the earnest money contract. *LMB*, 201 S.W.3d at 688; *Mohawk Mills*, 260 S.W.3d at 675–76; *Richardson-Eagle*, 213 S.W.3d at 474. Bryant's letter terminating the contract is inconsistent with the arguments Decker Oaks advances as to why the letter met that burden. Nor do the statements by the Weedns after the Bryant investors terminated the earnest money contract provide additional evidence of proximate cause. Susie Weedn stated in a letter to the lenders for the Saratoga Springs property that "we received a letter from our potential buyers that they will not purchase this property unless and until this exception is removed." (Docket Entry No. 7, Ex. 35). Robert Weedn told Royce Homes's Kopecky that "you stopped the sale on the project." (Bkrtcy Rec., Ex. 14 at 150). But Susie Weedn's statement was based on an interpretation of Bryant's letter that this court has already rejected as inconsistent with what it says. Robert Weedn's statement to Kopecky expresses Weedn's opinion about the Bryant investors' reason for the termination and is also at odds with the language of Steve Bryant's cancellation letter, which indicated that the Bryant investors were simply not ready to proceed with the sale.

The nonhearsay evidence in the record does not support the bankruptcy court's conclusion as to proximate cause, leaving this court with a "definite and firm conviction that a mistake has been committed." *In re Dennis*, 330 F.3d at 701. The nonhearsay evidence does not provide a basis for amending the judgment.

### 2.    **Weedn's Hearsay Testimony**

Decker Oaks also disputes this court's conclusion that consideration of Weedn's hearsay testimony to support the bankruptcy court's proximate cause finding would be plain error.  Weedn testified that Bryant "called up back and said there's a cloud on the title, there's this memorandum of contract from Royce Homes."  Weedn testified that Bryant told him "that he couldn't buy it or wouldn't buy it with this title defect."  (Bkrtcy Rec., Ex. 14 at 144–45).  Weedn testified that Bryant "called us up and . . . [said] there was a Memorandum of Contract or a cloud on the title.  He was going to terminate the contract but he was—continued to be interested in the property and he'd be working with his group if the title objections ever got off the title."  (*Id.*, Ex. 15 at 9–10).  Royce Homes did not raise a hearsay objection to this testimony.

Decker Oaks contends that this court erred in concluding that consideration of this testimony would be plain error.  But Decker Oaks does not dispute that the evidence the bankruptcy court relied on does not support a finding of proximate cause.  This court concluded that Steve Bryant's letter and the Weedns' statements after the termination do not support Decker Oaks's proximate cause contention.  Decker Oaks has cited no other evidence in the record on appeal that would support a finding of proximate cause.  Consideration of unobjected-to hearsay amounts to plain error if it is: "(1) an error; (2) that is clear and obvious under current law; (3) that affects the defendant's substantial rights; and (4) that would seriously affect the fairness, integrity or public reputation of judicial proceedings if left uncorrected."  *Tompkins v. Cyr*, 202 F.3d 770, 779 (5th Cir. 2000) (internal citations and quotations omitted).  When the only evidence supporting a finding or judgment is admitted through plain error, there is an impact on the party's substantial rights. *Anderson v. Siemens Corp.*, 335 F.3d 466, 473–74 (5th Cir. 2003).  Decker Oaks does not dispute that the admission of the hearsay testimony was an error that was clear and obvious under current

14

law.  Weedn's testimony was the only evidence in the record on appeal that would support Decker Oaks's proximate cause argument, meaning that considering this evidence would affect Royce Homes's substantial rights and the fairness of the outcome.  Consideration of Weedn's hearsay testimony as a basis for affirming the bankruptcy court's finding of proximate cause would be plain error.

Decker Oaks also contends that this court may consider Weedn's hearsay testimony because Royce Homes did not properly raise the plain-error issue on appeal.  Decker Oaks correctly points out that the burden of establishing plain error is on the party seeking to avoid the legal effect of erroneously admitted evidence.  *See United States v. Olano*, 507 U.S. 725, 734 (1993).  But Decker Oaks ignores the unusual posture in which the issue of Weedn's hearsay testimony arose.  The bankruptcy court did not cite Weedn's hearsay testimony in support of its proximate-cause finding or elsewhere in its opinion.  Royce Homes's initial appeal brief, which did challenge the sufficiency of the evidence to support the bankruptcy court's proximate-cause finding, did not specifically refer to the hearsay testimony because the bankruptcy court did not rely on or refer to that testimony.  Weedn's hearsay testimony was first raised by Decker Oaks in its response on appeal, which cited the testimony as additional evidence to support the bankruptcy court's conclusion.  (Docket Entry No. 10 at 14–15).  Royce Homes then addressed Weedn's testimony in its reply, arguing that Decker Oaks's arguments should fail because they were "based largely on Weedn's self-serving, hearsay, and conclusory testimony," and the other evidence Decker Oaks cited did not show proximate cause.  (Docket Entry No. 14 at 10).  Royce Homes also pursued the hearsay issue in the February 11, 2009 hearing before this court, at which the parties presented oral argument on the appeal.  (Docket Entry

No. 33).  Royce Homes carried its burden of showing that Weedn's hearsay testimony, if considered

as a basis for affirming the bankruptcy court's proximate-cause finding, would be plain error.

Decker Oaks also argues that Royce Homes cannot object to the consideration of Weedn's

hearsay testimony because it was invited error.  Counsel for Decker Oaks was the first to elicit

hearsay testimony from Weedn:

> Q.    And tell me what happened next in terms of Saratoga Springs
>       and your attempts to sell it to Mr. Bryant.
>
> A.    Well, he called up back and said there's a cloud on the title,
>       there's this memorandum of contract from Royce Homes.
>       . . . .
>
> Q.    And what did you do as a result of that?
>
> A.    Well, he told me that he couldn't buy it or wouldn't buy it
>       with this title defect.

(Bkrtcy Rec., Ex. 14 at 144–45).  On cross-examination, counsel for Royce Homes attempted to

rebut Weedn's contentions about the Bryant investors' motives with the language of Bryant's letter:

> Q.    [I]n the letter . . . he goes on to state, "I will continue working
>       with my group on this opportunity but rather than object to
>       the cloud on title from Royce Homes 2001 contract to get
>       more time on my feasibility [period], I would rather terminate
>       the contract and free you up to pursue other purchasers and if
>       the property is still available when my group is ready, I will
>       discuss a new contract with you at that time."  What did he
>       mean, "when my group is ready," sir?
>
> A.    He had called us up and asked us that . . . there was a
>       Memorandum of Contract or a cloud on title.  He was going
>       to terminate the contract but he was—continued to be
>       interested in the property and he'd be working with his group
>       if the title objection ever got off the title.
>
> Q.    "When my group is ready," you know, in the real estate
>       business because you were a broker for a number of years, I

> understand, that can mean the group has not got together its financing, can it not?
>
> A.    No, ma'am.  They had enough money to write a check for this property.
>
> Q.    And if, in fact, they were ready but for the title exception, Mr. Weedn, they didn't come in and file a title exception and tell you to go clear it within 15 days so they could buy it, did they?
>
> A.    That's right, yes, ma'am.

(Bkrtcy Rec., Ex. 15 at 9–10).

Royce Homes's cross-examination was not invited error.  "Invited error occurs when the appellant opens the door to objectionable testimony by introducing it, rather than waiting for the appellee to do so." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 n.6 (9th Cir. 2002). "Where, as here, a party simply cross-examines a witness to counter evidence already admitted, the error is not invited." *Id.* (rejecting the argument that the doctrine of invited error should preclude review of the district court's admission of improper testimony by the plaintiff's expert, where the defendant had failed to object to the expert's testimony on direct, and had subsequently cross-examined the expert about that testimony).  The case that Decker Oaks cites, *United States v. Davis*, 443 F.2d 560, 564–65 (5th Cir. 1971), is inapposite.  On cross-examination in *Davis*, the defendants did not merely attempt to rebut or limit the evidence the government had improperly introduced. Instead, the defendants "elicited further [improper] information and stressed that which the Government had introduced." *Id.* at 564.  In this case, by contrast, Royce Homes's counsel cross-examined Weedn with Bryant's letter in an attempt to contradict or mitigate the effect of Weedn's hearsay testimony.  Royce Homes's counsel's line of questioning did not "stress," rely upon, or

17

attempt to build upon, the hearsay testimony elicited from Weedn on direct examination.  Weedn's

hearsay testimony was not invited error.

Decker Oaks's arguments as to the effect of Weedn's hearsay testimony do not provide a

basis for amending the judgment.

### 3.        The Additional Exhibits Not in the Record on Appeal

Decker Oaks also seeks to introduce two documents that were part of the record before the

bankruptcy court but were not cited in the bankruptcy court's opinion and were not included in the

record on appeal.  The first document is a February 9, 2006 email from Michael Monju, the title

agent for the contract of sale, to Steve Bryant.  Monju's email discussed the results of the title

search:

> With respect to the above referenced file, please find
> attached a copy of the Commitment.  I am
> overnighting the complete package to you tonight.  I
> did want to point out to you the one major title issue:
> Exception 10an [sic], a Memorandum of Contract,
> filed by Royce Homes LP less than a month ago, in
> which Royce claims the right to purchase the subject
> property based on a contract from 2001.  For your
> information I've also included a copy of that contract
> which I obtained from Decker Oaks, as well as a
> demand letter from their attorney which was sent
> earlier this week.

(Docket Entry No. 39, Ex. 31).  The second document is a February 16, 2006 letter from Monju to

Susie Weedn about the Bryant investors' termination of the earnest money contract.  The letter

states:

> Please find enclosed our Check no. 8859 in the amount of $100.00
> representing the $100.00 termination fee, which under Paragraph
> 7B(1) of the contract, is due the Sellers.
>
> I'm sorry this one didn't work out.  I hope you make Royce Homes
> pay for it.  In any event Susie, thanks so much for allowing us to

> handle the transaction and if we can be of service to you in any other
> matter, please don't hesitate to call me.

(Docket Entry No. 39, Ex. 34).  Decker Oaks contends that these additional documents provide

sufficient evidence that the Memorandum of Contract proximately caused the Bryant investors to

terminate the earnest money contract.

Evidence not included in the record on bankruptcy appeal is not a proper basis for amending

an appellate judgment.  Federal Rule of Bankruptcy Procedure 8006 provides, in relevant part:

> Within 14 days after filing the notice of appeal as provided by Rule
> 8001(a), entry of an order granting leave to appeal, or entry of an
> order disposing of the last timely motion outstanding of a type
> specified in Rule 8002(b), whichever is later, the appellant shall file
> with the clerk and serve on the appellee a designation of the items to
> be included in the record on appeal and a statement of the issues to
> be presented.  Within 14 days after the service of the appellant's
> statement the appellee may file and serve on the appellant a
> designation of additional items to be included in the record on appeal
> and, if the appellee has filed a cross appeal, the appellee as cross
> appellant shall file and serve a statement of the issues to be presented
> on the cross appeal and a designation of additional items to be
> included in the record.

FED. R. BKRTCY P. 8006.  Under this rule, "[t]he appellant does not have the final word on the

designation of items to be included [on appeal]."  *In re Ichinose*, 946 F.2d 1169, 1173 (5th Cir.

1991).  The appellee "ha[s] the burden of ensuring that the record on appeal include[s] all of the

items relevant and necessary to its position."  *Id.* at 1174.  An appellee "cannot complain of the

absence of relevant orders when it fail[s] to submit a designation of additional items to be included

in the record on appeal," and when it "fail[s] to fulfill this responsibility, [it] correctly pa[ys] the

price."  *Id.*; *see also In re Kyle*, 317 B.R. 390, 394 (Bkrtcy 9th Cir. 2004), *aff'd* 170 F. App'x 457

(9th Cir. Mar. 1, 2006) ("Appellee had a duty to protect its victory in the trial court by assuring that

the appellate record was sufficiently complete to enable defense of that victory on the merits.").

19

Decker Oaks did not designate these documents as part of the record on appeal. These documents do not require amending the judgment.

Even considering these additional documents, however, amending the judgment is not appropriate. The first document, the February 9, 2006 email from Monju to Bryant, shows only that Monju brought the "major title issue" to the Bryant investors' attention. But the record on appeal, which this court fully considered in its March 18, 2009 order, already showed that the Bryant investors knew about the title issue raised by the Memorandum of Contract. The second document, the February 16, 2006 letter from Monju to Susie Weedn, shows Monju's opinion about the reason for the Bryant investors' decision to terminate the letter of credit. The record does not show the basis for that opinion. Monju's opinion is inconsistent with the plain language of Bryant's termination letter and subsequent email, the only evidence in the record from Steve Bryant about the reasons for the termination decision.

The Monju documents, which were not part of the record on appeal, do not provide a basis for amending the judgment.

### B.     The Foreclosure Deficiency

This court also concluded that even if Royce Homes did tortiously interfere with the Bryant investors' purchase of Saratoga Springs, Decker Oaks could not recover as consequential damages the $1,500,000 deficiency that remained after the foreclosures occurred months later. Decker Oaks argues that a lost-profits award for the tortious interference "takes into account the paying off in full of the underlying mortgages," and that the bankruptcy court's damage award based on the fact that the mortgages remained unpaid when the lenders foreclosed occurred was proper. (Docket Entry No. 39 at 13–14). Decker Oaks's argument does not provide a basis for amending the judgment.

20

Consequential damages "must be foreseeable and must be directly traceable to the wrongful act and result from it." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) (internal citations omitted).  This court concluded—and Decker Oaks does not now challenge—that "[t]here is no basis in the record to support a finding that in February 2006, when Royce Homes refused to remove the Memorandum of Contract from the property records, it was reasonably foreseeable not only that the Bryant investors would decide to cancel their earnest money contract, but also that Decker Oaks would not continue with its plans to construct the subdivision, would be unable to pay its lenders, and foreclosures would result."  (Docket Entry No. 37 at 42). Nor does Decker Oaks challenge this court's finding that there was no "basis in the record to support a finding that the November 2006 and March 2007 foreclosures and resulting deficiency were 'directly traceable to the wrongful act' of tortious interference with the Bryant investors' contract in February 2006."  (*Id.* at 43).  The record showed that neither party foresaw that the Bryant investors' cancellation would lead to foreclosure.  The evidence showed that after the Bryant investors cancelled the earnest money contract and before the lenders foreclosed, Decker Oaks continued to market the Saratoga Springs property to other prospective purchasers, received multiple offers to purchase the property or lots on the property, and assured its lenders of its plans to go forward with construction.  The foreclosures in November 2006 and February 2007, and the resulting deficiency balance, were not "directly traceable to" the February 2006 alleged tortious interference with the Bryant investors' contract.

Damages for tortious interference with the Bryant investors' contract would be the foreseeable losses directly traceable to the loss of that contract in February 2006.  Those damages do not include the $1.5 million deficiency after the November 2006 and March 2007 foreclosures.

21

Decker Oaks's arguments as to the deficiency judgment do not provide a basis for amending the judgment.

**IV.      Conclusion**

Decker Oaks's motion for rehearing and to amend the judgment is denied.

SIGNED on July 6, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge